ELECTRICAL ENGINEERING AND ELECTRONICS, INC., Plaintiff

v.

E.L. SHEA, INC., and Fidelity And Deposit Company Of Maryland, Defendants

No. CIV. 99–274–B.

United States District Court, D. Maine.

June 5, 2001.

Jeffrey T. Edwards, Preti, Flaherty, Beliveau, Pachios & Haley, LLC, Portland, ME, Robert E. Miller, Old Town, ME, for Electrical Engineering and Electronics Inc, Plaintiff.

Roger G. Innes, Mt Desert, ME, Jon S. Oxman, Linnell, Choate & Webber, Auburn, ME, James M. Moore, U.S. Attorney's Office, Bangor, ME, for E L Shea Inc, Fidelity and Deposit Company of Maryland, Defendants.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

The Court now has before it Plaintiff Electrical Engineering and Electronics, Inc.'s (hereinafter "3E") Motion to Make Additional Findings and to Amend Judgment (Docket No. 37). *See* Fed.R.Civ.P. 52(b). Defendants E.L. Shea, Inc. (hereinafter "E.L. Shea") and Fidelity and Deposit Company of Maryland (hereinafter "Fidelity") oppose 3E's motion (Docket Nos. 38 and 40).

This case was tried without a jury. The Court issued a Memorandum of Decision and Order on January 15, 2001. *See* Docket No. 35. Subsequently, Judgment was entered. *See* Docket No. 36. In its pre-trial and post-trial briefs, 3E focused on the issues relating to additional compensation for the cost of materials and labor related to the substitution of electrical metallic tubing ("EMT") and building wire for metal clad cable ("MC cable"). *See* Plaintiff's Trial Brief (Docket No. 30) and Brief of Plaintiff (Docket No. 32). Plaintiff 3E did not address certain claims in its pretrial and post-trial briefs, and the Court did not address those claims in its Memorandum of Decision and Order. Specifically, the Court did not take up Plaintiff's claims, asserted in Counts I and II, to recover unpaid amounts under the contract for the temporary power, the television mounting brackets, and the costs associated with additional testing of the elevator. In addition, the Court did not address Plaintiff's claim, asserted in Count III under the prompt payment statute, 10 M.R.S.A. § 1111 *et seq.*, for statutory interest and attorneys' fees on the unpaid contract balance, for a $4,600 payment made on March 30, 2000, and for a $30,000 payment made on March 20, 1999. Plaintiff now requests that the Court address these issues, make additional findings of fact, and amend its Judgment.

Briefly, the facts relevant to Plaintiff's motion are as follows.[1] This action arises out of the construction of the Squadron Operations Building for the Maine Air National Guard in Bangor, Maine. The owner of the project was the Maine National Guard. The general contractor for the project was Defendant E.L. Shea, and Defendant Fidelity issued the project performance and payment bonds for E.L. Shea. E.L. Shea entered into a contract with 3E, the terms of which provided that 3E would be the electrical subcontractor for the Squadron Operations Building. *See* Defendants' Ex. 1, Subcontract.[2] The electrical subcontract incorporated the electrical specifications of the Project Manual for the Squadron Operations Building. *See* Plaintiff's Ex. 1, Project Manual.

## I. UNPAID CONTRACT BALANCES

■ In addition to the claims addressed by the Court in its Memorandum of Decision and Order, Plaintiff asserts entitlement under the contract to $7,505.81 in unpaid amounts for the temporary power, the television mounting brackets, and costs associated with elevator retests. *See* Amended Complaint Counts I and II (Docket No. 9). Defendants dispute that these amounts are due and owing under the contract.

### A. Temporary Power

The parties agree that E.L. Shea withheld $4,017.30 from 3E for the cost of

1. Most of the exhibits in this case were admitted by stipulation of the parties. At trial, however, the Court reserved decision on the admission of Plaintiff's exhibits 119, 121, and 127 and Defendants' exhibits 6, 7, 8, 28, 38, and 41. After reviewing Defendants' reserved exhibits, the Court will sustain Plaintiff's objection to the admission of, and will exclude from evidence, Defendants' exhibits 6, 7, 8, 28, 38, and 41. With respect to Plaintiff's reserved exhibits, the Court orders exhibit 121 admitted and the parties have stipulated that Plaintiff's exhibits 119 and 127 never existed. In addition, the Court notes that

although previously admitted in evidence by stipulation, the parties have now agreed that Plaintiff's exhibits 86 and 116 never existed. *See* Docket No. 42. Finally, although Defendants' exhibit 2 was admitted by stipulation of the parties, Defendants now acknowledge that Defendants exhibit 2 never existed. *See* Docket No. 41 and 43.

2. The Court relies on Defendants' copy of the Subcontract since Plaintiff's copy is missing a page. *See* Plaintiff's Ex. 6.

temporary power that was provided to the site.[3] In addition, 3E contends that it is owed $1,068.03 for temporary power costs it paid in error. The Subcontract between Shea and 3E provides in part:

> The Subcontractor shall perform all the Work required by the Contract Documents for
>
> Division 16–ELECTRIC
>> Division 16–ELECTRIC
>> INCLUDES:   BASE BID
>>            ADDENDUMS NO. 1 & 2
>>            ABI # 1–4

Defendants' Ex. 1, Subcontract at 2. Division 16 of the Project Manual provides the electrical specifications for the project. With respect to temporary electrical power, division 16 of the Project Manual provides "Arrange for, obtain permits, and provide, temporary lighting and power for the duration of the project. Electric energy consumed under this provision will be paid for by the Contractor." Plaintiff's Ex. 1, Project Manual § 16010, 1.12(A). At issue is the meaning of the word "Contractor" in the electrical specifications of the Project Manual. Plaintiff asserts that the word "Contractor" in the electrical specifications of the Project Manual is a reference to E.L. Shea and, thus, that E.L. Shea was responsible for the cost of temporary power. Defendants counter that "Contractor" in the electrical specifications refers to 3E.

In division 16 of the Project Manual, the Court has identified references to both "electrical subcontractor" and "Contractor." *See* Plaintiff's Ex. 1, Project Manual § 16010, 1.7 ("Electrical submittals shall be reviewed by, and carry the approval stamp of, the electrical subcontractor and be initialed and dated by the reviewer.");

*id.* § 16010, 1.12(A) ("Arrange for, obtain permits, and provide, temporary lighting and power for the duration of the project. Electric energy consumed under this provision will be paid for by the Contractor."); *id.* § 16320, 3.6(C) ("Contractor to provide inrush current curves for each transformer."); *id.* § 16400, 3.2(G) ("Panelboard circuiting has been worked out with breakers numbered and increasing in size and number of poles from top to bottom. If this is not retained, the Contractor shall be responsible for revising contract drawings and paying to have it done."); *id.* § 16500, 1.3(I) ("Transportation charges for samples shall be paid by Contractor."); *id.* § 16500 2.13(E)(1) ("Occupant sensor calibration shall be performed by the Contractor prior to system turnover and rechecked and recalibrated three months later . . . . Contractor shall first arrange for and receive on-site training by a representative of the system manufacturer in a number of spaces . . . on the project."); *id.* § 16725, 1.4(A) ("Prior to installation [of security alarm system] submit data showing that the Contractor is a factory approved installer and has at least five years experience installing security alarm systems . . . ."); *id.* § 16740, 3.1(H) ("Contractor shall repair and replace all defective cables and/or connectors as necessary [in the telephone and data wiring system]."). After studying division 16, it is arguable that because the electrical specifications make use of the designation "electrical subcontractor" and "Contractor," those terms necessarily denote different entities. However, the language of division 16 does not support this interpretation.

---

**3.** Plaintiff does not break down the $7,505.81 it asserts in unpaid contract balances. Defendants agree to the breakdown as follows: $4,017.30 for temporary power; $2,688.51 for television mounting brackets; and $800

for additional testing of the elevator. The evidence in the record confirms that the cost of temporary power withheld by E.L. Shea is $4,017.30. *See* Defendants' Ex. 11.

The parties provided no testimony as to whether the charges for temporary electrical power are customarily the responsibility of the general contractor or the electrical subcontractor. In addition, the parties did not provide any testimony at trial that would assist the Court in understanding whether the references to "Contractor" in division 16 delineated work that could be reasonably understood to be performable by the general contractor or whether the work designated to "Contractor" was of such a technical nature that it must necessarily refer to the electrical subcontractor. Some of the references to "Contractor" in division 16 appear to require work of such a specialized nature that the Court finds that it is unlikely that they refer to the general contractor, E.L. Shea. *See, e.g.,* Plaintiff's Ex. 1, Project Manual § 16500 2.13(E)(1) ("Occupant sensor calibration shall be performed by the Contractor prior to system turnover and rechecked and recalibrated three months later .... Contractor shall first arrange for and receive on-site training by a representative of the system manufacturer in a number of spaces ... on the project."); *id.* § 16725, 1.4(A) ("Prior to installation [of security alarm system] submit data showing that the Contractor is a factory approved installer and has at least five years experience installing security alarm systems ...."); *id.* § 16740, 3.1(H) ("Contractor shall repair and replace all defective cables and/or connectors as necessary [in the telephone and data wiring system]."). The Court finds that the word "Contractor" used throughout division 16 is intended to uniformly designate one entity. Based on the specialized nature of the work described in the sections where the references to "Contractor" are made, the Court further finds that 3E has failed to estab-

lish that the word "Contractor" in § 16010, 1.12(A) of the Project Manual refers to the general contractor, E.L. Shea. Therefore, 3E is not entitled to recover the temporary power costs it paid or E.L. Shea withheld.

## B. Television Mounting Brackets

■ The parties agree that E.L. Shea withheld $2,688.51 from 3E for the cost E.L. Shea incurred for installing the television mounting brackets. *See* Defendants' Ex. 10. The contractual provisions relating to the television mounting brackets simply make reference to the provision of mounting brackets for televisions. *See* Plaintiff's Ex. 1, Project Manual § 16050, 2.9(C) and § 16780, 1.1(B). Plaintiff contends that E.L. Shea erroneously withheld payment for the installation of the television mounting brackets that, under the terms of an amendment to the contract, was the responsibility of E.L. Shea. Plaintiff 3E relies on an amendment to the contract specifications that includes questions submitted by potential subcontractors reviewing the specifications and answers provided thereto. *See* Plaintiff's Ex. 2.[4] Specifically, 3E points to the answer to the following series of questions incorporated into the addenda to the Project Manual: "Who does TV mounting brackets? Where are specifications? Who installs TV's?" The addenda sets forth the following answer: "General Contractor installs TV mounting [b]rackets. Specifications for TV mounting bracket is found in Section 16780—Closed Circuit TV Wiring System. Coordinate work with Government furnished TV's to provide a complete operating system." *See id.* Defendants assert that the contractual provisions requiring 3E to provide the mounting brackets implicitly require 3E to install the brackets.

4. At trial, the parties stipulated to the admission of Plaintiff's exhibit 2 as a document that amended the Project Manual.

The Court finds that the language of the amendment to the contract specifications of the Project Manual explicitly states that the general contractor—E.L. Shea—is responsible for installing the mounting brackets. *See id.* The Court, therefore, holds that 3E is owed $2,688.51 under the terms of the contract for the cost of installing the television mounting brackets.

### C. Elevator Retests

■ The parties all agree that E.L. Shea withheld $800 from 3E for the cost E.L. Shea incurred for retesting the elevator. *See* Defendants' Ex. 17. The parties appear to agree that the propriety of E.L. Shea's withholding of the sum turns on the question of which party caused the delay. Plaintiff contends that the additional elevator testing resulted from delays caused by E.L. Shea's failure to properly schedule the work of other subcontractors necessary to complete the elevator and have it tested. Defendant E.L. Shea asserts that the need for the additional testing of the elevators was caused by 3E's failure to complete its work.

Plaintiff has failed to meets its burden of proof on this issue. Although Plaintiff produced some testimony at trial regarding the cause of the elevator retesting, such testimony was insufficient to establish that the responsibility for the need to retest the elevator lies with E.L. Shea. The Court, therefore, finds that 3E is not owed $800 for the cost of retesting the elevator.

## II. PROMPT PAYMENT STATUTE

■ In Count III, 3E contends that E.L. Shea violated Maine's prompt payment statute by withholding the payments it owed 3E for the mounting brackets.[5] In addition, 3E contends that E.L. Shea violated Maine's prompt payment statute by not making two progress payments—one for $4,600 and the other for $30,000—in a timely manner as required by the statute. For these violations, 3E requests statutory interest and attorney's fees. With respect to the monies withheld for the mounting brackets, Defendant E.L. Shea maintains that it had a good-faith claim for the monies withheld, and, thus, that it did not violate the statute. As to the two other instances, Defendant E.L. Shea argues that 3E has waived its right to recover under the statute by not asserting its claim for these damages in its Amended Complaint or trial brief or at any time during trial. In the alternative, E.L. Shea contends that 3E should not recover any penalty or attorney's fees because the $30,000 payment was paid by the time Plaintiff filed this action and the $4,600 payment was not due after March 2000, which was after the lawsuit was filed but before the case was tried. Opposing Memorandum to Plaintiff's Motion to Make Additional Findings and to Amend Judgment (Docket No. 38) at 4.

Maine's prompt payment statute provides, in pertinent part:

> Notwithstanding any contrary agreement, when a subcontractor ... has performed in accordance with the provisions of a contract, a contractor shall pay to the subcontractor ... the full or proportional amount received for each subcontractor's work and materials based on work completed or service provided under the subcontract, 7 days after receipt of each progress or final payment or 7

---

5. 3E also argues that the prompt payment statute is violated by E.L. Shea's withholding the cost of the temporary power and elevator retests. Because of the Court's conclusion above that 3E failed to establish that the temporary power and elevator retest costs were withheld in error, it is not necessary to address 3E's argument under the prompt payment statute with respect to those items.

days after receipt of the subcontractor's ... invoice, whichever is later.

10 M.R.S.A. § 1114(3).[6] A delay in the payment schedule provided for in § 1114(3) requires the contractor to pay the subcontractor interest on any unpaid balance. *See* 10 M.R.S.A. § 1114(4). In addition, if litigation is commenced to recover payment due and the contractor is found to have wrongfully withheld payment, the statute provides for an award of damages in the form of a penalty and reasonable attorney's fees and expenses to the prevailing party. *See* 10 M.R.S.A. § 1118(2) and (4). Under the statute, a contractor is permitted to withhold payment:

> in whole or in part under a construction contract in an amount equalling the value of any good faith claims against an invoicing ... subcontractor ..., including claims arising from unsatisfactory job progress, defective construction or materials, disputed work or 3rd-party claims.

10 M.R.S.A. § 1118(1). "A payment is not deemed to be wrongfully withheld if it bears a reasonable relation to the value of any claim held in good faith by the ... contractor ... against which an invoicing ... subcontractor ... is seeking to recover payment." 10 M.R.S.A. § 1118(3).

Plaintiff 3E contends that E.L. Shea violated Maine's prompt payment statute by withholding the payment it owed 3E for the installation of mounting brackets. The Court's determination that E.L. Shea's interpretation of the terms of the contract was incorrect does not automatically entitle 3E to interest, penalties, or attorney's fees under the statute. As contractor, E.L. Shea has the right to withhold payment of any "amount equalling the value of any good faith claims against an invoicing ... subcontractor." 10 M.R.S.A. § 1118(1). The Court finds that the payment withheld by E.L. Shea bears direct relation to the value of the disputed claim and that E.L. Shea held this claim in good faith. The Court will, therefore, deny 3E's claim for recovery under Maine's prompt payment statute.

■ Plaintiff 3E also contends that E.L. Shea violated Maine's prompt payment statute on two other occasions by not paying it in a timely manner as required under the statute. First, 3E asserts that E.L. Shea violated the statute when it approved a change order for $4,600 in light fixtures on March 26, 1999, and did not tender payment for those fixtures until March 30, 2000. The statute requires that the determination of a late payment be made by reference to either when the progress payment was received by E.L. Shea from the owner for the work billed in 3E's $4,600 invoice or when 3E's $4,600 invoice was received by E.L. Shea, whichever is later. *See* 10 M.R.S.A. § 1114(3).

6. The statute also provides that the "[t]he contractor or subcontractor shall pay a subcontractor or material supplier strictly in accordance with the terms of the subcontractor's or material supplier's contract." 10 M.R.S.A. § 1114(1). The contract between 3E and E.L. Shea provides that that E.L. Shea shall pay 3E each progress payment or the final payment within three working days after E.L. Shea receives payment from the owner or, if E.L. Shea does not receive payment for any cause which is not the fault of 3E, E.L. Shea shall pay 3E on demand. *See* Defendants' Ex. 1, at §§ 5, 6, 12.4.1 and 12.4.3. Plaintiff does not advise the Court which provision it believes applies in determining whether the payment statute has been violated; that is, whether the Court should utilize the payment provisions of 3E's contract with E.L. Shea or the statutory payment scheme. *Compare* 10 M.R.S.A. § 1114(1) *with* § 1114(3). In this case, the result does not change whether the Court analyzes the facts under the payment schedule set forth in the statute or the contract.

Plaintiff provided the Court with absolutely no evidence to indicate when E.L. Shea received any progress payment from the owner. The late payment is then established, if at all, by reference to when E.L. Shea received the invoice from 3E that included the $4,600 for light fixtures. The invoice representing the change order for light fixtures is not signed or dated, except to provide that the request for payment covers the period from November 11, 199[8] through April 30, 1999.[7] *See* Plaintiff's Ex. 117. The invoice for the light fixtures appears to have been submitted sometime after April 30, 1999. *See id.*[8] The exact date those fixtures were invoiced is essential to determining if there has been a violation of the statute. On this record, 3E has failed to establish that the $4,600 payment made on March 20, 2000, violated the prompt payment statute.

Finally, 3E contends that the prompt payment statute was violated when it had submitted invoices to E.L. Shea on October 21, 1998, totaling $40,427 and E.L. Shea did not tender its payment of $30,000 until March 20, 1999. *See* Plaintiff's Ex. 117. Plaintiff's account statement for the project indicates that it issued invoice 17 on September 22, 1998, for $38,432, of which E.L. Shea paid $4,917, leaving a balance of $33,515. *See* Plaintiff's Ex. 107. One month later, on October 21, 1998, 3E's account statement indicates that it issued invoice 18 for $6,912. *See* Plaintiff's Ex. 107. Thus, as of October 21, 1998, 3E's account statement for this project indicates that there was an unpaid contract balance of $40,427.[9] *See id.* E.L. Shea paid $30,000 of the contract balance by check on March 20, 1999.[10] *See* Plaintiff's Ex. 110.

The Court will deny 3E's claim for interest under the prompt payment statute on the $30,000 progress payment.[11] Here again, the statute requires that the determination of a late payment be made by reference to either when the progress payment was received by E.L. Shea from the owner for the work billed in 3E's invoices totaling $40,427 or when 3E's invoices totaling $40,427 were received by E.L. Shea,

7. Although 3E was ultimately paid for the light fixtures, the record contains no evidence of when a change order for the light fixtures was approved.

8. Over 170 exhibits were admitted by stipulation in this case. Most of the exhibits admitted in evidence were never shown to any of the witnesses or referred to in briefing by counsel. The Court is disturbed by the failure of Plaintiff's counsel to cite to any of the exhibits admitted in evidence that support his arguments. It is not wise for Plaintiff's counsel to rely on the Court to review all of the documents and determine which may be relevant to his arguments.

9. The Court relies on 3E's account statement instead of the invoices for two reasons. First, Plaintiff did not offer invoice 18 in evidence at trial. There was an invoice originally designated 18, but that designation was later changed to 19. That invoice is dated October 23, 1998, for $11,170. There is no evidence

of when, if ever, invoice 18 for $6,912 was ever submitted. In addition, the Court finds it necessary to rely on the account statement because it is the only method by which the Court has been able to determine how Plaintiff arrived at the unexplained $40,427 figure.

10. The check stub for the March 20, 1999, check indicates that the $30,000 payment is for invoices 17 and 18, which were both issued on March 9, 1999, in the amount of $25,315 and $4,685, respectively. *See* Plaintiff's Ex. 110.

11. The Court notes that 3E's claim for violation of the prompt payment statute for the alleged $30,000 late payment is properly considered only for statutory interest under § 1114(3) and not for the assessment of penalties and attorney's fees since this claim was paid before this action was commenced. *See* Complaint filed in Penobscot County Superior Court on September 28, 1999 (Docket No. 1); 10 M.R.S.A. § 1118(2) and (4).

whichever is later. *See* 10 M.R.S.A. § 1114(3). As stated above, there is absolutely no evidence to indicate when E.L. Shea received any progress payment from the owner. With respect to the other method for determining whether a payment is late—when E.L. Shea received the invoices representing the work included in 3E's payment request totaling $40,427—the record does not support a violation of the statute.

Plaintiff has failed to provide invoice 18 to support when its request for payment for this work was made to E.L. Shea. With respect to requisition 17, the evidence that E.L. Shea paid part of invoice 17 supports the conclusion that E.L. Shea received an invoice requesting payment for an amount in excess of $4,917. *See* Plaintiff's Ex. 107. Nevertheless, the evidence establishes that there was a good-faith basis for withholding payment on invoices 17 and 18. The evidence indicates that 3E failed to correct deficient items of work until sometime in early March 1999, although E.L. Shea had requested that the changes be made in September 1998. *See* Plaintiff's Ex. 104. This conclusion is supported by the evidence that after 3E corrected the problems, it issued new invoices 17 and 18 on March 9, 1999, which apparently requested the reduced payment of $30,000 for its work. *See* Plaintiff's Ex. 110. The Court finds that E.L. Shea acted in good faith in withholding the $30,000 from 3E. *See* 10 M.R.S.A. § 1118(1) and (3). Therefore, E.L. Shea's payment of $30,000 on March 20, 1999, was not in violation of the statute.

### III. CONCLUSION

The Court has found that E.L. Shea has erroneously withheld payment of $2,688.51 from 3E for the installation of mounting brackets. Accordingly, the Court **ORDERS** that an Amended Judgment be entered in favor of Plaintiff Electrical Engineering and Electronics, Inc. and against Defendant E.L. Shea on Count I and in favor of Plaintiff Electrical Engineering and Electronics, Inc. and against Defendant Fidelity and Deposit Company of Maryland on Count II for Two Thousand Six Hundred Eighty–Eight Dollars and Fifty–One Cents ($2,688.51). Judgment shall be entered on Counts I and II against Defendants jointly and severally. It is further **ORDERED** that Judgment be entered for Defendant E.L. Shea on Count III of the Amended Complaint.