STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
BCD-CV-15-74; BCD-RE-15-06;
BCD-RE-15-11


FORTNEY & WEYGANDT, INC.,
        Plaintiff/Counterclaim Defendant
v.

OAKLAND, DMEP IX, LLC. DOLLAR
TEXAS PROPERTIES, LLC, AND GBT
REALTY CORPORATION,
        Defendants/Counterclaim Plaintiffs
_____

FORTNEY & WEYGANDT, INC.,
        Plaintiff/Counterclaim Defendant
v.


LEWISTON DMEP IX, LLC, et al
        Defendants/Counterclaim Plaintiffs
_____

FORTNEY & WEYGANDT, INC.,
        Plaintiff/Counterclaim Defendant
v.

WEST PARIS, DMEP X, LLC, et al
        Defendants/Counterclaim Plaintiffs

**ORDER ON MOTION TO
DETERMINE AMOUNT OF
LIQUIDATED DAMAGES
WITHHELD IN GOOD FAITH**


        Before the Court is a motion brought by Plaintiff/Counterclaim Defendant Fortney &

Weygandt after remand from the Law Court, asking this Court to determine the amount of

liquidated damages withheld in good faith by Defendant GBT Realty Corporation. The Court has

reviewed the Law Court decision dated December 30, 2019 [2019 ME 175], the

Combined Judgment issued by this Court on August 9, 2018, and the filings of the parties, the

last of which was received on March 23, 2020, and issues the following Order.

1

The issues before the Court require it to decide which party is correctly interpreting language in the Law Court decision, and what this Court is expected to do upon remand. As the parties know, the Law Court refers to the error committed by this Court as occurring within "one aspect of its analysis" regarding its determination of remedies to which Plaintiff was entitled to receive under Maine's prompt payment statutes, 10 M.R.S. §§ 1111-1120. 2019 ME 175, ¶ 25.

Defendant GBT had framed its argument to the Law Court on this issue as follows:

GBT next argues that the trial court erred by awarding F & W any remedies pursuant to Maine's prompt pay statutes . . . GBT also asserts more narrowly that the court erred by including the unpaid retainage invoice in the amount subject to prompt payment remedies and that, pursuant to section 1118(3), the court should have excluded from the calculation of those remedies at least the amount GBT withheld in good faith.

*Id. ¶ 24.*

The Law Court went on to hold that, while this court committed no error in determining that F & W was entitled generally to remedies under the statutes, it erred "because the court failed to consider the mitigating effect of its finding that GBT had, in good faith, withheld $498,000 as liquidated damages that it claimed were contractually owed by F & W." *Id. ¶ 25.*

GBT understandably reads this as the Law Court finding that this Court found that all of the $498,000 was withheld in good faith. Plaintiff argues that this Court never specifically found that all of the $498,000 was withheld in good faith, and in its Reply brief points to language in the Combined Judgment where this Court essentially avoided making such an explicit finding. Plaintiff states that "Such a determination (by this Court) was unnecessary because this court held that even if the entire amount was withheld in good faith, then that amount would not bear a 'reasonable relation' to the entire amount withheld by GBT." [Reply brief, pg. 2]

The Court would note at the outset that because Plaintiff failed to ask the Law Court for clarification or reconsideration of this issue, this Court and the parties are constrained by, and must follow as best they can, the language in the Law Court decision.

The Court does recognize that it is possible to interpret the Law Court's decision as stating on the one hand that this Court did not find that all of the $498,000 liquidated damages claimed were withheld in good faith, while other language suggests that it was.

> This leaves GBT's assertion that the court erred by imposing prompt payment on the entire amount *when the court found that some of that amount* was withheld based on GBT's good-faith belief that it was entitled to recover liquidated damages from F & W. More specifically, the court found that even though GBT was unsuccessful on the merits, GBT *withheld $498,000 as liquidated damages in good faith*. Despite that finding, the court ultimately concluded that F & W was entitled to prompt payment remedies calculated the basis of *all* payments that GBT withheld – including the amount withheld in good faith – because the total "amount withheld far exceeded the value of GBT's potential liquidated damages [claims]."

2019 ME 175, ¶ 30 (emphasis added).

The Law Court also held as follows:

> Consequently, the trial court should have, in some way, *accounted for the of GBT's liquidated* damages claims held in good faith when considering amount that is subject to prompt payment statute remedies available to F & W.

*Id.* ¶ 32.

And the Law Court further stated:

> For these reasons, we vacate the portion of the judgment denying GBT any statutory accommodation based on the amount it withheld in good faith in the court's determination of damages to which F & W is entitled pursuant to the prompt payment statutes, and "*we remand for the court to reconsider and recalculate that portion of the award.*"

*Id.* ¶ 33.

The Court has also reviewed its Combined Judgment of August 9, 2018. In that Judgment the Court found that the amount withheld by GBT actually came to $1,445,959 if the amount of

3

retainage withheld is included, in addition the amount of liquidated damages withheld. The Law Court found no error in including either the liquidated damages amount of $498,000 plus the retainage amount in the Court 's calculation of total amount of payments withheld. However, the Law Court found that this Court erred by not reducing the total amount of penalties downward in recognition of the liquidated damages that were withheld in good faith.

The Court has concluded that the Law Court's statement regarding this Court's finding that $498,000 was withheld in good faith was not a mistake that could have been corrected if a timely motion to reconsider was filed. That is because in reviewing the analysis in the Combined Judgment, this Court did conclude that $498,000 was the amount of liquidated damages that were withheld and that those damages were withheld in good faith. The disproportion found by this Court was that the *total amount withheld* was almost three times the amount of the liquidated damages withheld. The error was in concluding that this required penalties to be assessed on the total amount, with no adjustment for the liquidated damages which were withheld in good faith.

In sum, this Court agrees with Plaintiff that it avoided making an explicit finding as to whether all of the $498,000 withheld as liquidated damages was held in good faith, or lesser amount.  Because it viewed the total amount of money withheld by GBT to be unreasonably disproportionate to the total amount of liquidated withheld, the Court did not make any more particular finding regarding the $498,000 figure. However, the Court cannot conceive of a reason not to have considered the full amount of $498,000 of liquidated damages to have been the amount that was reasonably withheld. GBT has consistently claimed that it believed it had the right pursuant to the Master Contract to assess liquidated damages in this case, and given the language in the Master Contract and the way the projects progressed that position was not on its face an unreasonable one to take. Finally, the Court does not believe that any party actually

4

argued this point one way or another at the trial level, and no party asked this Court to make a more specific finding after the Combined Judgment was issued.

Therefore, the entry will be: The parties are bound by the finding on page 17 of the Law Court decision, and further finds that it is consistent with the analysis used by this Court in the Combined Judgment. The total amount of liquidated damages withheld in good faith was $498,000.

The Clerk shall note this Order on the docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

Dated: _4/22/2020_____          _____/S_____

**M. MICHAELA MURPHY**

**SUPERIOR COURT JUSTICE**

**Fortney & Weygandt**

v.

**Owner Entities:**
**(Lewiston DMEP IX, LLC**
**Auburn DMEP IX, LLC**
**Turner DMEP IX, LLC**
**Oakland DMEP IX, LLC**
**West Paris DMEP X, LLC**
**Dollar Texas Properties IX, LLC**
**Dollar Properties East, LLC**
**GBT Realty Corporation**
**First Tennessee Bank National Association**
**DG Retail, LLC)**
**Rapid Ralph & Son, Inc.**

| | |
|---|---|
| **Fortney & Weygandt, Inc.** | Gavin McCarthy, Esq.<br>Pierce Atwood<br>Merrills Warf<br>254 Commercial St<br>Portland, ME 04101 |
| **Owner Entities** | Michael Bosse, Esq.<br>Bernstein, Shur, Sawyer & Nelson<br>PO Box 9729<br>100 Middle Street<br>Portland, ME 04101-5029 |

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
LOCATION: PORTLAND

FORTNEY & WEYGANDT, INC.,

       Plaintiff,

       v.

OAKLAND DMEP IX, LLC; DOLLAR
TEXAS PROPERTIES IX, LLC; & GBT
REALTY CORPORATION;

       Defendants.

Docket No. BCD-CV-15-74

FORTNEY & WEYGANDT, INC.,

       Plaintiff,

       v.

LEWISTON DMEP IX, LLC; AUBURN
DMEP IX, LLC; TURNER DMEP X,
LLC; DOLLAR TEXAS PROPERTIES
IX, LLC; DOLLAR PROPERTIES
EAST, LLC; & GBT REALTY
CORPORATION;

       Defendants.

Docket No. BCD-RE-15-06

FORTNEY & WEYGANDT, INC.,

       Plaintiff,

       v.

WEST PARIS DMEP X, LLC;
DOLLAR TEXAS PROPERTIES X,
LLC; & GBT REALTY
CORPORATION;

       Defendants.

Docket No. BCD-RE-15-11

## COMBINED JUDGMENT

1

This matter comes before the Court following a nine-day bench trial held in Portland, Maine. The parties before the Court are Plaintiff/ Counterclaim Defendant Fortney & Weygandt, Inc. ("F&W") who is represented by David Very, Esq. and by Michael Fortney, Esq. *pro hac vice*, and the Defendants/ Counterclaim Plaintiffs, multiple limited-purpose entities listed in the caption above and all under the corporate umbrella of GBT Realty Corporation, referred to collectively throughout this Judgment as "GBT." GBT is represented by Michael Bosse, Esq. and Conor Shankman, Esq. Service has been properly effectuated on all Defendants.

## PROCEDURAL HISTORY

This case began when F&W filed complaints against GBT in Androscoggin, Kennebec, and Oxford County Superior Courts asserting claims for breach of contract, violation of the Prompt Payment Act, and enforcement of mechanic's liens. GBT filed its initial answers in each case on October 14, 2015. The three cases, along with numerous third-party complaints and related cases involving approximately ten of F&W's subcontractors, were transferred to the Business and Consumer Docket on December 1, 2015. All of the cases were subsequently consolidated under the three docket numbers in the above caption. GBT filed its amended answer and counterclaim for breach of contract against F&W in BCD-CV-15-74 on February 17, 2016 and thereafter filed supplemental answers and counterclaims for breach of contract against F&W in the remaining docket numbers on March 21, 2016.

The case proceeded to discovery and in the month of April, 2017, both sides filed motions for summary judgment on F&W's claims for breach of contract and GBT's counterclaims for breach of contract and liquidated damages in each docket number. These motions were directed at specific work that GBT claimed was within the scope of its contract with F&W and that F&W had failed to adequately perform; each side also filed a motion for summary judgment on the issue of

2

GBT's entitlement to liquidated damages in each docket number. These motions were all opposed by each side's adversary and fully briefed. Oral argument was heard on the motions on June 29, 2017. The Court decided these motions for summary judgment in its combined order dated July 17, 2017 and entered in all three dockets on July 18, 2017 (the "Summary Judgment Order").

The Summary Judgment Order did not fully decide the case but did narrow the issues remaining for trial.[1] The matter was then scheduled for trial and the first five days of trial occurred in Portland from November 13-17, 2017. The trial was not completed and additional days were scheduled from January 16-23, 2018. Notwithstanding a cancellation due to inclement weather on January 17, the parties completed the presentation of evidence on January 22, 2018. Each side filed a post-trial brief by March 2, 2018; the deadline for rebuttal briefs was thereafter enlarged and each side filed a rebuttal brief by March 23, 2018. The evidence is now closed and the case is fully briefed and ready for decision.

## FACTS

I.  OVERVIEW OF PARTIES AND PEOPLE

1.  **GBT.** GBT is a commercial real estate developer based out of Brentwood, Tennessee. (Robinson, 1/16/2018, 22:24-23:5.)

    a.  **Ron Stewart:** Vice President of Construction. (Freeh, 11/13/2017, 55:5.) Mr. Stewart was F&W's primary contact at GBT during the construction of the five

---

[1] The Court concluded that F&W was entitled to partial summary judgment on its breach of contract claims for unpaid payment applications in each docket number, amounting to a total of $819,737.41 between the three actions. (Summ. J. Order 22.) The Court also concluded that F&W was entitled to partial summary judgment on three of GBT's counterclaims for breach of contract with respect to damages for the cost of removing and replacing the concrete slabs at the Turner and West Paris store locations in BCD-RE-15-06 and BCD-RE-15-11 and with respect to damages for the cost of replacing the Lewiston store roof in BCD-RE-15-06. (Summ. J. Order 25-26, 31.) With regards to GBT's claim for liquidated damages, the Court concluded that there were genuine issues of material fact as to whether GBT voluntarily or intentionally relinquished its rights to seek liquidated damages by its conduct, whether GBT misrepresented its intentions when its representatives told F&W that contract extension issues would be addressed after the Maine stores were completed, and whether F&W justifiably relied on GBT's misrepresentation. (Summ J. Order 15-16.)

3

Maine stores. (Freeh, 11/13/2017, 55:2-3.) Mr. Stewart no longer works at GBT. (Lozina, 1/22/2018, 230:8.) Mr. Stewart did not testify at trial.

b. **Craig Cole:** Managing Director, Net Leasing Division. (Freeh, 11/13/2017, 1119:4-6.) Mr. Cole was Mr. Stewart's superior and another important "point person" for F&W at GBT during the construction of the Maine stores. (Freeh, 11/13/2017, 55:24-56:1.) Mr. Cole still worked at GBT as of the last day of trial. (Lozina, 1/22/2018, 230:6.) Mr. Cole did not testify at trial.

c. **Don Robinson:** Vice President of Construction. (Robinson, 1/16/2018, 23:17.) Mr. Robinson was brought onto the projects in January 2015. (Robinson, 1/16/2018, 30:1.) Mr. Robinson no longer works at GBT. (Lozina, 1/22/2018, 230:10.) Mr. Robinson testified at trial.

d. **Ivan Lozina:** Senior Vice President of Construction. (Lozina, 1/19/2018, 198:6.) Mr. Lozina was brought on to the projects in the summer of 2015. (Lozina, 1/19/2018, 204:13-15.) Mr. Lozina testified at trial.

e. **George Tomlin:** President and CEO of GBT. (Robinson, 1/16/2018, 22:24-23:5.) Mr. Tomlin did not testify at trial.

f. **Will Beard:** Manager of Construction Services. Mr. Beard negotiated the contracts for the five Maine DG stores on behalf of GBT. (Freeh, 11/13/2017, 68:14-70:16.) Mr. Beard did not testify at trial.

g. **Tom Russo:** Project Manager. Mr. Russo was a point of contact for F&W in December 2014 and January 2015, concurrently with Mr. Stewart. (Freeh, 11/13/2017, 55:11-16.) Mr. Russo no longer works at GBT. (Lozina, 1/22/2018, 230:4.) Mr. Russo did not testify at trial.

4

h. **Jenny Baylor:** Construction Management Coordinator. Ms. Baylor no longer works at GBT. (Lozina, 1/22/2018, 230:2.) Ms. Baylor did not testify at trial.

2. **F&W.** F&W is a commercial general contractor based out of North Olmstead, Ohio. (Freeh, 11/13/2017, 50:1-8.)

    a. **Greg Freeh:** President. (Freeh, 11/13/2017, 49:22.) Mr. Freeh was President of F&W during the construction of the five Maine stores; his predecessor, Bob Fortney,[2] negotiated the contracts for their construction with Mr. Beard. (Freeh, 11/13/2017, 68:14-70:16.) Mr. Freeh testified at trial.

    b. **Sam Fortney:** Project Manager. Sam Fortney was the project manager for the construction of the Lewiston and Oakland stores. (Fortney, 11/14/2017, 10:21-23.) Mr. Fortney testified at trial.

    c. **Paul Lewis:** Project Manager. Mr. Lewis was the project manager for the construction of the Auburn and Turner stores. (Lewis, 11/15/2017, 141:14-15.) Mr. Lewis testified at trial.

    d. **Andy Vannice:** Project Manager. Mr. Vannice was the project manager for the construction of the West Paris store. (Vannice, 11/16/2017, 155:12-16.) Mr. Vannice testified at trial.

3. **Dollar General.** Dollar General is a nationwide discount retailer.

    a. **Scott Francis:** Senior Construction Manager for the Northeast Territory. (Francis, 1/18/2018, 130:6-8.) Mr. Francis represented DG's interests with regards to the construction of the five Maine stores. As described in considerable detail below the construction of the stores was significantly

---

[2] Bob Fortney passed away after a long illness in the Fall of 2014. (Freeh, 11/13/2017, 51:21-25.)

delayed. As a result, Mr. Francis was much more involved in the construction of the five Maine stores than he typically would be, and was on-site frequently, particularly in 2015. (Francis, 1/18/2018, 130:7-12.) Mr. Francis testified at trial.

## II.    FACTUAL OVERVIEW

GBT contracted with F&W for the construction of five DG stores in Maine (the "Maine stores"). DG executed five triple net leases[,] to rent the Maine stores from GBT upon their completion. This was not the first time that F&W had constructed DG stores for GBT; F&W had previously constructed nine DG stores in Pennsylvania and Ohio for GBT. (Freeh, 11/13/2017, 52:18-54:5.)

Before commencing construction of the Maine stores, GBT and F&W executed three master construction contracts (the "Master Contract"), all of which contained identical terms. (Def's Ex. 49; Pl's Com. Ex. 28.[.]) Subsequently, GBT and F&W executed four contract addenda to construct the Auburn, Lewiston, Oakland, and Turner stores. (Def's Exs. 104-107.) These contract addenda are dated between June-August 2014. (*Id.*) GBT and F&W negotiated the cost and award of these four stores as a package. (Fortney, 11/14/2017, 180:25-181:4; Freeh, 11/15/2017, 19:5-14.) Shortly thereafter, on September 10, 2014, the parties executed an addendum for the construction of a fifth DG store in West Paris. (Def's Ex. 108.)

The five addenda for the Maine stores each contained the date of substantial completion for that respective store. The date of substantial completion is the contractually agreed upon

---

[,] A triple net lease means that DG was responsible for taxes, insurance, and maintenance. (Robinson, 1/16/18, 111:21-112:4.)

[.] Defendant GBT used one set of exhibits for all three lawsuits. Plaintiff F&W had one set of exhibits for all three suits, "Common Exhibits," abbreviated "Com.", and a set of exhibits unique to each suit: "Turner/Auburn/Lewiston," BCD-RE-15-06, abbreviated "Lew."; "Oakland," BCD-CV-15-74, abbreviated "Oak."; and "West Paris," BCD-RE-15-11, abbreviated "W.P."

6

deadline by which each of the Maine stores must be substantially complete: "sufficiently complete in accordance with the Contract Documents so that the Owner may occupy or utilize the Project . . . for the use for which it is intended, without unscheduled disruption." (Def's Ex. 49 at § 2.4.24.) The Court concluded on summary judgment that the substantial completion date could only be extended by change order.[5] The substantial completion dates for each of the five Maine stores were as follows:

1. Lewiston: November 6, 2014.

2. Turner: January 15, 2015.

3. Oakland: January 30, 2015.[6]

4. Auburn: February 8, 2015.

5. West Paris: April 23, 2015.

(Def's Exs. 52 at 0593, 104-108.) F&W delivered all five stores after the date of substantial completion.

The parties seem to agree[7] as to when each store actually reached substantial completion, as follows:

1. Lewiston: February 16, 2015.

---

[5] A "change order" is "a written order signed by the Owner and the Contractor after execution of this Agreement, indicating changes in the scope of the Work, the Contract Price, or Contract Time, including substitutions proposed by the Contractor and accepted by the Owner." (Pl's Com. Ex. 28 at § 2.4.3.) Each of the five projects has its own unique set of sequentially numbered change orders. (*See* Def's Exs. 50-54.) GBT could issue change orders of its own accord or in response to a "request for change order" submitted by F&W.

[6] The Oakland project's substantial completion date was extended from November 6, 2014 to January 30, 2015 by Oakland change order number 5, issued on December 17, 2014. (Def's Ex. 52 at 0593.) No other change orders were issued by GBT to extend the substantial completion date for any other store, although as explained below F&W attempted to extend the substantial completion date unilaterally in several requests for change orders issued from F&W to GBT.

[7] *See* Pl's Ex. 32; Def's Post-Trial Br. at 3. As discussed in more detail below, F&W's position throughout this lawsuit has been that the substantial completion dates were extended by agreement of the parties (an argument this Court rejected on summary judgment) or that GBT was equitably estopped from or had waived its right to assess liquidated damages against F&W. F&W has never necessarily disputed that the stores reached substantial completion on the dates reflected in Mr. Cole's correspondence of August 21, 2015, assessing liquidated damages against F&W for all five Maine store. (*See* Pl's Ex. 32.)

7

2. Turner: June 11, 2015.

3. Oakland: June 25, 2015.

4. Auburn: March 9, 2015.

5. West Paris: July 6, 2015.

(Pl's Com. Ex. 32.) GBT made the internal decision to stop paying F&W's invoiced progress payments as early as April 2015. (Pl's Com. Ex. 57.) However, GBT did not notify F&W of its decision at that time. In fact, although there continued to be communication between representatives of the parties related to completing the jobs until as late as July 30, 2015, (*see* Def's Exs. 1-2; Lewis, 11/15/2017, 124:24-125:10), Greg Freeh was unable to get an answer from anyone at GBT related to payment for the unpaid invoices. (*See* Pl's Com. Ex 64.) As a result of the unpaid invoices, F&W sent a letter to GBT on July 31, 2015, notifying GBT that F&W intended to stop work on the projects pursuant to section 9.4 of the Master Contract[8] unless payment of the outstanding invoices was received. (Pl's Com. Ex. 29.) This letter cited section 9.2 of the Master Contract[9] and notified GBT that F&W would "stop all work on the referenced projects in seven days unless all overdue invoices are paid in full." (Pl's Com. Ex. 29.) GBT did not respond to this letter. (Freeh, 11/13/2017, 118:16-18.) F&W followed up with another letter on August 7, 2015 notifying GBT that F&W was stopping all further work on the projects. (Pl's Com. Ex. 30.) F&W

---

[8] Section 9.4 of the Master Contract provides:
> If for any reason not the fault of the Contractor the Contractor does not receive a progress payment from the Owner within twenty-one (21) Days after the time such payment is due, then the Contractor, upon giving seven (7) Days' written notice to the Owner, and without prejudice to and in addition to any other legal remedies, may stop Work until payment of the full amount owing to the Contractor has been received, including interest for late payment. The Contract price and Contract Time shall be equitably adjusted by a Change Order for reasonable cost and delay resulting from shutdown, delay and start-up. (Def's Ex. 49.)

[9] Section 9.2 of the Master Contract provides:
> The Owner may adjust or reject a payment application or nullify a previously approved payment application, in whole or in part, as may reasonably be necessary to protect the Owner from loss or damage based upon [eight specifically delineated contingencies], to the extent that the Contractor is responsible under this Agreement. (Def's Ex. 49.)

8

stopped work on the projects at that time but remained ready and able to resume work upon payment of the overdue invoices and the issuance of a change order. (Freeh, 11/13/2017, 120:17.) Although Mr. Freeh testified that GBT did not respond to the August 7 letter, in fact Mr. Cole did respond, in five letters dated August 21, 2015, to both the August 7 letter and a follow-up request for mediation sent August 14, 2015. (Freeh, 11/13/2017, 119: 20-21; Pl's Com. Exs. 31-32.) The August 21 letters expressed Mr. Cole's dissatisfaction with F&W's work on the Maine stores and claimed that F&W's work stoppage was inappropriate under the Master Contract. (Pl's Com. Ex. 32.) These letters also assessed liquidated damages against F&W.[10] (Pl's Com. Ex. 32.)

A flurry of correspondence between GBT's general counsel and F&W and its attorney ensued.[11] (*See* Pl's Exs. 34, 36-37, 38-39.) The letters from GBT purport to constitute notices of default and notices of intent to terminate contract by reason of that default under the Master Contract. (Pl's Exs. 34, 36, 38-39; *see* Def's Ex. 49 at §§ 11.2, 11.3.1.) The letters from F&W's counsel rejected the notices as deficient under the Master Contract. (Pl's Exs. 33, 35, 37.)

III.     LIQUIDATED DAMAGES

The Court heard evidence on the three factual issues identified in the Summary Judgment Order related to whether GBT waived its right to assess liquidated damages or was equitably estopped from assessing liquidated damages against F&W: 1. Whether GBT voluntarily or intentionally relinquished its rights to seek liquidated damages by its conduct; 2. Whether GBT misrepresented its intentions when its representatives told F&W that contract extension issues would be addressed after the Maine stores were completed; and 3. Whether F&W justifiably relied

---

[10] Liquidated damages were assessed from the substantial completion date listed in the contract addendum for each project, including Oakland, notwithstanding the fact that the substantial completion date for Oakland had been extended by change order. (Pl's Oak. Ex. 103 at 00131; Pl's Com. Ex. 32.)

[11] GBT's general counsel repeatedly sent correspondence directly to Mr. Freeh despite having received multiple letters from F&W's attorney and an explicit request to send all future correspondence to the lawyer directly. *See* M.R. Prof. Conduct 4.2.

on GBT's alleged relinquishment or misrepresentation. (Summ. J. Order 15-16.)

1. Whether GBT Voluntarily or Intentionally Relinquished its Rights to Seek Liquidated Damages by its Conduct

GBT issued many change orders expanding F&W's scope of work on each project after the substantial completion date for that project had passed:

1. The substantial completion date for the Lewiston store was November 6, 2014. GBT issued twenty-two change orders on or after November 6, 2014. The final change order was issued on July 20, 2015. These change orders addressed *inter alia* unforeseen site issues, winter conditions, and changes to the landscaping plan. (Pl's Lew. Ex. 106.)

2. The substantial completion date for the Oakland store was, as extended, January 30, 2015. GBT issued seventeen change orders for the Oakland store on or after January 30, 2015. The final change order was issued on August 21, 2015. The final change order issued prior to F&W's work stoppage was issued on July 20, 2015. (Pl's Oak. Ex. 103.)

3. The substantial completion date for Turner was January 15, 2015. GBT issued twenty-two change orders on or after January 15, 2015. The final change order was issued on July 21, 2015.

4. The substantial completion date for the Auburn store was February 8, 2015. GBT issued sixteen change orders on or after February 8. The final change order was issued on August 21, 2015. The final change order prior to F&W's work stoppage, number 32, was issued July 20, 2015. (Pl's Lew. Ex. 105.)

5. The substantial completion date for West Paris was April 23, 2015. GBT issued twelve change orders on or after April 23. The final change order was submitted on June 22, 2015.

F&W employees attempted to notify GBT about delays and request extensions to the substantial completion date. (*See* Pl's Ex. 48 at § 6.3.) As explained in more detail below, GBT

responded to some of these requests by telling F&W that time extensions would be dealt with after the projects were complete. Most of the notifications and requests were met with silence.

On December 15, 2014, F&W project manager Sam Fortney wrote a letter to GBT documenting delays on the Oakland project, attaching an updated project schedule, and "anticipating completing the building by February 20, 2015." (Pl's Oak. Ex. 131.) GBT did not respond to this correspondence or otherwise object to the proposed extended substantial completion date on the updated project schedules. (Fortney, 11/14/2017, 101:12.)

On January 6, 2015, F&W project manager Paul Lewis sent a letter to Tom Russo, project manager at GBT, detailing delays experienced on the Auburn project and requesting an extension of the substantial completion date, along with an updated schedule showing an extended substantial completion date. (Pl's Lew. Ex. 280.) Mr. Lewis sent a substantially similar letter to Mr. Russo regarding the Turner project on the same date. (Pl's Lew. Ex. 281.) A scanned copy of each letter was sent to Mr. Russo and copied Messrs. Stewart, Cole, and Beard. (Pl's Lew. Exs. 280, 281.) GBT did not respond to Mr. Lewis's request; instead, Mr. Cole emailed Mr. Beard to ask whether the letters "do[] anything." (Pl's Com. Exs. 106, 107.) Mr. Beard replied that the two men should meet to review the contract because he thought they "ha[d] them on a technicality because the[y] didn't provide notice . . . within the specified discovery period." (Pl's Com. Ex. 47.)

In addition to this correspondence requesting extensions to the substantial completion date, Mr. Fortney and Mr. Lewis also endeavored to extend the substantial completion date unilaterally on change order request forms. The change order form used by GBT includes a box labeled "The Contract time be changed by (days)" and another box showing the substantial completion date. The former box was pre-filled with a zero on the forms when they were issued by GBT and the

11

field could not be changed in GBT's electronic change order request form. (Fortney, 11/14/2017, 74:21-75:2; *see generally* Def's Exs. 50-54.) Mr. Fortney crossed out the zero and wrote a specific number in the box on three change orders. (Pl's Lew. Ex. 106 at 00361, 00442, 00450.) Mr. Fortney also attempted to change the substantial completion dates on five Oakland change orders in a similar way. (Pl's Oak. Ex. 103 at 00106, 00136, 00182, 00193, 00206.) Mr. Lewis made similar changes to the "Contract time be changed" box on nine change orders for the Auburn project and eight for the Turner project, either by notating a specific number of days, like Mr. Fortney, or by crossing out the zero and sometimes writing "TBD" in the box. (Pl's Lew. Exs. 105 at 01092, 01099, 01123, 01132, 01164, 01198, 01278, 01379; 01387; 107 at 00195, 00204, 00229, 00240, 00247, 00270, 00299, 00364.) Mr. Lewis testified that "TBD" means "to be determined." (Lewis, 11/15/2017, 164:11.) These changes were ignored by GBT; Mr. Lozina testified that the changes were "meaningless." (Lozina, 1/22/2018, 154:20.)

Finally, the Court heard evidence that F&W provided a number of schedules to GBT that indicated a substantial completion date later than the substantial completion date in the contract addenda, and that GBT never objected to these schedules. (*See* Pl's Lew. Exs. 110, 117-118; Pl's Oak. Ex. 107; Pl's W.P. Ex. 107.) These schedules were provided to GBT by F&W's project managers. (Fortney, 11/14/2017, 17:4-18:22; Lewis, 11/15/2017, 151:14; Vannice, 11/16/2017, 159:16.)

With regards to Lewiston, F&W produced six schedules. (*See* Pl's Lew. Ex. 117.) The schedule was initially altered by Mr. Fortney at GBT's request to extend the substantial completion date from November 1, 2014 to December 29, 2014. (Pl's Lew. Exs. 43, 117, 127.) When Mr. Fortney first submitted project schedules for the Lewiston and Oakland projects to GBT on August 15, 2014 that had F&W substantially completing the Lewiston store on November 1, 2014, Mr.

12

Stewart responded that "the building cannot set for more than 45 days. Our [turnover] date is 2/4/15. Please adjust the schedule to ensure the intent of the project schedule is met." (Pl's Com. Ex. 43; *see* Pl's Lew. Ex. 117 at p. 1.) Mr. Fortney responded with an updated schedule reflecting a substantial completion date of December 29, 2014 and the message "Take a look at this schedule and let me [know] what you think." (Pl's Lew. Ex. 127; *see* Pl's Lew. Ex. 117 at p. 2.) Mr. Stewart replied "That works. Never thought I would say this in my career. Don't finish early." (Pl's Lew. Ex. 127.)

This same email correspondence discussed the scheduling of the Oakland project, as testified to by Mr. Fortney, although GBT eventually issued a no-cost change order extending the substantial completion date for that project. (Fortney, 11/14/15, 63:5-64:22.) In his initial response to Mr. Fortney's email about the Lewiston schedule, Mr. Stewart replied that he "still need[ed] schedules for [Oakland]." (Pl's Com. Ex. 43.) Mr. Fortney asked Mr. Stewart for the Oakland turnover date, then followed up with updated schedules reflecting a later substantial completion date for that store as well. (Pl's Com. Ex. 43; Pl's Oak. Ex. 107 at pp. 2, 3.) Later, in December 2014, GBT issued two change orders that included the substantial completion date of November 6, 2014, which Mr. Stewart had previously complained was "too early." (Pl's Oak. Ex. 103 at 00106-00120.) Mr. Fortney followed up with Jenny Baylor, construction management coordinator at GBT who emailed Mr. Fortney the change orders. Mr. Fortney wrote that "The substantial completion date is not correct on these. Oakland and Lewiston were both pushed to February. Would it be possible to change the date on these change orders? Should I change the date?" (Pl's Com. Ex. 44.) Ms. Baylor forwarded the request to Mr. Stewart, who responded that he was "fine with that." (Pl's Com. Ex. 44.) Mr. Fortney was copied on these emails. (Pl's Com. Ex. 44.) On December 17, 2014, GBT issued a no-cost change order "to change the substantial completion date

13

from 11/6/14 to 1/30/15."[12] (Pl's Oak. Ex. 103 at 00131.) As noted above, GBT did not issue a change order extending the substantial completion date for the Lewiston project.

Subsequent schedules from F&W indicated a substantial completion date of February 16, 2015 for the Lewiston store project. Mr. Stewart did not object to these schedules and F&W (Messrs. Fortney and Freeh in particular) believed that Mr. Stewart, through his silence, agreed to the substantial completion dates reflected in those schedules. (Fortney, 11/14/2017, 31:8-9; Pl's Lew. Ex. 117.) GBT did not object to the updated project schedules or the substantial completion date reflected therein. GBT's internal correspondence does not reflect dissatisfaction with the Lewiston schedule either: on December 21, 2014, Mr. Russo wrote to Craig Cole that "Overall, Lewiston is in great shape schedule, and process. Clean site." (Pl's Lew. Ex. 192.)

With regards to Auburn, F&W periodically sent updated project schedules to GBT, with the final such schedule dated February 20 reflecting a substantial completion date of March 9, 2015. (Lewis, 11/15/2017, 151:8-11; Pl's Lew. Ex. 110.) Each successive schedule reflected a later substantial completion date. (Pl's Lew. Ex. 110.) This was a result of the "obstacles" encountered on the project, obstacles that were "well-communicated" to GBT via the schedules and other correspondence. (Lewis, 11/15/2017, 168:12-18.) GBT never objected to these schedules or communicated any dissatisfaction therewith. (Lewis, 11/15/2017, 151:9-24, 168:14-15.) Mr. Lewis testified similarly with regard to the Turner project: that he periodically updated the project schedules for the Turner project, that these schedules were shared with GBT, and that no one at GBT ever expressed any dissatisfaction with the substantial completion date reflected in those schedules notwithstanding the fact that it was later than the substantial completion date established

[12] Updated schedules for the Oakland project thereafter continued to purport to extend the substantial completion date for that store. In fact, Mr. Stewart confirmed a May 18, 2015 date in his April 3 email. (F&W Comm. Ex. 55; 11/14/2017, 67:13-17.)

in the contract addendum. (Lewis, 11/15/2017, 170:3-171:7.) Contemporaneous correspondence from GBT suggests that they acknowledged and agreed with the substantial completion dates reflected in the updated schedules. (Pl's Com. Ex. 51, 59; Pl's Lew. Exs. 245, 247, 250.)

Mr. Vannice testified that he likewise periodically updated the project schedules for the West Paris store, that these schedules were shared with GBT, and that GBT never expressed any dissatisfaction with the schedules notwithstanding the fact that it was later than the substantial completion date established in the contract addendum. (Vannice, 11/16/2017, 157:7-160:5.)

## 2. Whether GBT Misrepresented its Intentions when its Representatives Told F&W that Contract Extension Issues would be Addressed after the Maine Stores were Completed

The Court heard from multiple F&W employees that when they raised concerns related to finishing their work by the substantial completion date, they were told the same thing by representatives of GBT: that the extension of the substantial completion dates would be discussed after the projects were complete.

The Court first heard from Mr. Freeh. He testified that Mr. Robinson met with him with a cooperative attitude in January 2015, and that the upshot of that meeting was an email from Mr. Robinson setting "new dates" for the Maine store. Mr. Freeh understood those "new dates" to be the new substantial completion dates for those stores. (Freeh, 11/13/2017, 130:19-132:25, Pl's Com. Ex. 51.) Mr. Freeh was explicit that this was consistent with what Mr. Fortney was being told.

Sam Fortney, project manager for the Lewiston and Oakland stores, testified next. The substantial completion date in the contract addendum for Lewiston is November 6, 2014 and this date was never changed via change order, although the substantial completion date in the project schedule was extended at GBT's request, as described above. Mr. Fortney explained that F&W

15

had been led to believe that GBT had agreed to a later substantial completion date on both projects. (Fortney, 11/14/2017, 19:24-22:17.)

Both projects suffered delays and F&W was unable to meet the extended substantial completion dates reflected in F&W's updated schedules submitted at Mr. Stewart's request as described above. These delays are described in some detail below. Mr. Fortney testified that he communicated with Mr. Stewart regarding concerns with completing the two projects by the extended substantial completion date, and that "Ron Stewart would . . . tell me [ ] to keep on pushing. We're not going to deal with time extensions until we're finished with the project. We'll deal with time extensions at the end of the project." (Fortney, 11/14/2017, 51:13-17.)

The Court next heard testimony from Mr. Lewis (project manager for the Auburn and Turner stores). Mr. Lewis testified that he "had a few conversations with Ron Stewart about change orders for the extension of time. And it was stated to me that we would deal with a change order to extend the substantial completion at one time, at the end of the job taking into consideration all of the change orders." (Lewis, 11/15/2017, 164:13-18.) Mr. Lewis further testified that Mr. Stewart informed him "that at the end of the project with all of the change orders, we would write one last change order to extend the date to [sic] substantial completion." (Lewis, 11/16/2017, 72:4-15.) According to Mr. Lewis, those conversations with Mr. Stewart never took place. (Lewis, 11/16/2017, 72:10-15.) As noted above, Mr. Stewart did not testify at trial.

Mr. Lewis's testimony is corroborated by a December 18, 2014 email chain to Mr. Lewis, the F&W team, and the GBT team. (Pl's Com. Ex. 102.) This email chain starts with an email from Ms. Baylor that attaches change orders numbers 3 and 4 for the Auburn store project. Presumably, these change orders were issued in response to a change order request from F&W through Mr. Lewis, as Mr. Lewis follows up six days later with an email to "Tom, Will, Ron and Jenny" asking

16

them to disregard the change orders because, *inter alia*, "there are time considerations[.]" Ron Stewart responds to this email "Time should not affect the changes. What cost change if any was there?" Mr. Cole replies to Mr. Stewart "What?" Mr. Stewart clarifies:

> Paul made a reference to time. If the cost was correct [on change orders numbers three and four then] I'm asking what time has to do with it . . . . In other words, the [change order] was for the scope of work, not for General Conditions. [General conditions] can be handled separately and not affect the processing of the [change order] or Pay App.

(Pl's Com. Ex. 102.)

### 3. The Parties Prior Course of Dealing

In its Summary Judgment Order, the Court noted that the parties' prior course of dealing could be evidence of whether F&W's reliance was justifiable.[13] (Summ. J. Order 16.) At trial, the Court heard evidence that F&W had previously constructed nine Dollar General stores for GBT. (Freeh, 11/13/2017, 52:24-25.) Most of these stores reached substantial completion after the substantial completion date contemplated in the contract addendum for that store. GBT did not assess liquidated damages against F&W for any of those stores.

These nine DG stores F&W constructed for GBT prior to undertaking the five Maine store projects were in Pennsylvania and Ohio. As with the Maine stores, Mr. Stewart was F&W's primary point of contact at GBT for the construction of these nine stores. (Freeh, 11/13/2017, 55:2-18, 56:2-6.) Mr. Cole was also involved in these prior projects as Mr. Stewart's superior in charge of GBT's net lease division, the same position he held during the construction of the Maine stores. (Freeh, 11/13/2017, 55:24-56:1.) Sam Fortney was F&W's project manager for six of these prior

---

[13] Assuming that the Court concludes that GBT acted inconsistently with its contractual right to assess liquidated damages against F&W, this evidence is relevant only to determining whether F&W justifiably relied on that conduct in deciding that GBT had waived or was equitably estopped from asserting the right.

projects. (Freeh, 11/13/2017, 66:3-15.) The contract documents governing these projects had the same provisions that are at issue in this case. (Freeh, 11/13/2017, 54:15-24.)

Most of these projects were not substantially complete until after the substantial completion date reflected in the contract addenda had passed, and with the exception of the Conneaut, Ohio and Jamestown, Pennsylvania stores, the substantial completion date was never adjusted or extended by change order. The Court finds as follows:

1. The Jamestown, Pennsylvania project reached substantial completion 444 days after the substantial completion date indicated on the last change order.[14] (Freeh, 11/13/2017, 57:16-58, 25; Pl's Com. Exs. 16-18.)

2. The Perry, Ohio project finished 220 days after its substantial completion date. (Freeh, 11/13/2017, 62:13-64:2; Pl's Com. Exs. 19-21.)

3. The Bettsville, Ohio project reached substantial completion 183 days after its substantial completion date. (Freeh, 11/13/2017, 61:1-25; Pl's Com. Exs. 4-6.)

4. The Youngstown, Ohio project reached substantial completion 85 days after its substantial completion date. (Freeh, 11/13/2017, 64:5-24; Pl's Com. Exs. 25-27.)

Two of the other projects also reached substantial completion after the substantial completion in the contract addendum. (*See* Pl's Com. Exs. 1-3 (Ashley); 13-16 (Ellwood City);

---

[14] There was limited testimony regarding the two-year discrepancy between the substantial completion date reflected in this change order and the substantial completion date in the contract addendum for the Jamestown project (January 8, 2011 and January 8, 2013, respectively). (Freeh, 11/13/2017, 58:14-25; Pl's Com. Exs. 16-17.) On cross-examination, Mr. Freeh testified that he did not know whether the substantial completion date in the change order was the result of a typographical error. (Freeh, 11/14/2017, 255:9-16.) GBT did not have any witness testify that it was the result of a typographical error. The terms of the Master Contract expressly state that change orders trump the other contract documents in the case of inconsistency. (Pl's Com. Ex. 28 at § 14.2.5.) (*See* Summ. J. Order 23-24.) By the same reasoning the Court finds that the Cresson store reached substantial completion in advance of its substantial completion date because it reached substantial completion before the date reflected on the final change order. (Pl's Com. Ex. 11; Freeh, 11/14/2017, 253:2-3.)

18

22-24 (Toronto).) GBT did not assess liquidated damages on any of the prior projects. (Fortney, 11/14/2017, 23:12-24:8, 51:20; Freeh, 11/13/2017, 57:16-64:24.)

IV.    DELAYS

The Court heard a substantial amount of testimony about delays encountered at each of the five stores. This testimony is complemented by multiple exhibits such as schedules, change orders, photographs, and correspondence that reflect the significant delays experienced at the stores. Both sides seem to agree that the delays on these projects were not typical. However, the parties disagree as to the root cause of these delays, and whether the other party could have done more to mitigate the delays or accelerate the projects.

For the most part, whether one party is more or less responsible for the delays encountered at the five Maine stores is irrelevant to the issues to be resolved in this case. However, the facts and circumstances of the delays are relevant to a determination of whether F&W was reasonable in its belief that GBT had waived its right to assess liquidated damages and whether GBT withheld payment from F&W in good faith.

1.    Weather

Unusually harsh winter weather[15] delayed construction on all five Maine stores. The weather data from the Turner, Maine weather station from October to May 2015 is in evidence. (Pl's Lew. Ex. 125.) The Turner weather station is in relative proximity to the Lewiston, Auburn, and Turner stores. The temperatures recorded at the Turner station in December 2014 through March 2015 were generally below average. (*Compare* Pl's Lew. Ex. 125 *with* Pl's Lew. Ex. 306.) The weather data for the Oakland project is measured by the Waterville weather station. (*See* Pl's

---

[15] Winter conditions were excluded from F&W's bid on the project, meaning that GBT was required to cover the costs for dealing with winter conditions—special equipment, snow removal, etc. Therefore, costs for winter conditions could only be approved by change order. (Lewis, 11/16/2017, 17:8.)

Oak. Ex. 111.) The temperatures recorded in Waterville were likewise below average. (*Compare* Pl's Oak. Ex. 111 *with* Pl's Oak. Ex. 184.) Finally, the weather data for the West Paris store location is measured at the closest weather station in Poland, Maine. (*See* Pl's W.P. Ex. 110.) This weather data shows that temperatures were below average at the West Paris store location as well. (*Compare* Pl's W.P. Ex. 110 *with* Pl's W.P. Ex. 191.)[16] These weather reports also record precipitation, and the Court heard testimony from F&W's three project managers that there were several winter storms during construction of the five stores. These winter conditions caused delays. (Fortney, 11/14/2017, 32:4-5; Lewis, 11/15/2017, 157:9-12; Vannice, 11/16/2018, 160:16-20.)

F&W informed GBT of the delays caused by winter weather. In internal correspondence from Mr. Cole to Mr. Tomlin discussing a potential liquidated damages assessment against GBT by DG, Mr. Cole notes that the "sites were subject to four actual blizzard events, and record-setting low temps[.]" (Pl's Com. Ex. 63.) Mr. Cole also notes "the extensive reporting and daily updates on the[] projects[.]" (Pl's Com. Ex. 63.) Finally, Mr. Cole points out that GBT had paid "remarkable change orders for ground heat, tenting, winter conditions, you name it." (Pl's Com. Ex. 63.)

### 2. Lewiston

F&W encountered soils unsuitable for building at the Lewiston work site,[17] specifically large amounts of blue marine clay. (Fortney, 11/14/2017, 32:2-33:5; Pl's Lew. Exs. 128, 282.) As a result, GBT was required to issue change orders to remove the unsuitable subgrade soil and

---

[16] The Court notes that this comparison is not as elucidating as for the prior cases, as Pl's W.P. Ex. 110 reflects temperatures recorded at Poland, Maine while Pl's W.P. Ex. 191 shows temperature averages for Hartford, Maine. Nonetheless, the Court takes judicial notice that Poland, Maine is within 25 miles of both Hartford, Maine and West Paris, Maine. M.R. Evid. 201(c).

[17] Site remediation was not part of F&W's scope of work; GBT hired the geotechnical engineer directly and was responsible for ensuring that the buildings could be constructed at the sites as identified in the plans. (Pl's Com. Ex. 28 at § 3.16.2.) Therefore, to the extent that "site issues" delayed construction on any of the stores, F&W is not ultimately responsible for that delay.

replace it with structural fill. (Pl's Lew. Ex. 106, at LEW 0320-0339.) The site remediation authorized by these change orders could not be done without a recommendation from GBT's geotechnical engineer, JTC. (Fortney, 11/14/2017, 35:5-7, Pl's Lew. Ex. 128.) Mr. Fortney informed GBT of his communication issues with JTC and expressed the urgency of the situation to JTC; nonetheless, JTC did not have a representative on site for over a week, compounding the delays caused by the site issues. (Fortney, 11/14/2017, 34:13-35:7; Pl's Lew. Ex. 128.)

Furthermore, the site plan for the Lewiston project was changed pursuant to direction from the Maine Department of Environmental Protection. (Fortney, 11/14/2017, 35:18-36:8.) The site plan was revised on December 4 and change order five was issued by GBT on January 5, 2015 to implement the required design changes. (Pl's Lew. Ex. 105; Fortney, 11/14/2017, 36:3-11.) This change order, change order 5, was one of many issued by GBT after the date of substantial completion for the Lewiston store had passed.

3. Auburn

F&W encountered unforeseen site conditions at the Auburn worksite that required GBT to issue over $175,000 in change orders. (Pl's Lew. Ex. 105, at AUB 1007-1012, 1044-1050, 1066-1080.) The work authorized by these change orders made up the majority of the earthwork contractor's scope of work. (Lewis, 11/15/2017, 157:4-9.) This work included undercuts with stone fill, soil remediation in the parking lot, and excavation and hauling away of bad soils. (Pl's Lew. Ex. 105 at AUB 001007, 001044, 001066.) The site remediation work resulted in delays. (Lewis, 11/15/2017, 157:15.)

4. Turner

F&W likewise encountered unforeseen site conditions that required remediation at the Turner store location. (Lewis, 11/15/2017, 181:8-13.) Organic material, which needed to be

21

removed and replaced, was found at both the building pad and parking lot areas. F&W also discovered boulders during the footer excavation (Lewis, 11/15/2017, 195:6-198:6; Pl's Lew. Exs. 113-114, 148, 154.) Remediation of these site conditions resulted in delays in pouring the building slab. This caused the winter condition delays described generally above to have a compounding effect on the construction of the Turner store, as critical tasks were extended into the winter months. Special equipment was required to thaw the ground and protect the slab from the cold and snow; all of this additional work required GBT to issue change orders. Furthermore, the extreme cold impacted productivity as workers were only able to work outdoors intermittently and for short periods. Low temperatures also caused equipment failure. (Lewis, 11/16/2017, 32:19-33:19.)

F&W discovered an underground spring that Mr. Lewis testified he was hopeful would "find its level underground" and cease to bubble up to the surface. (Lewis, 11/16/2017, 35:5-20.) This hope proved unfounded as the spring continued to run through the winter, causing ice to form and flow onto the building pad, interfering with the erection of the building. (Lewis, 11/16/2017, 35:21-37:5; Pl's Lew. Exs. 197-198.) F&W's subcontractors were required to use excavating equipment and jackhammers to remove the ice buildup from the building area. (Lewis, 11/16/2017, 40:17-41:2; Pl's Lew. Exs. 198, 204.) While it is not surprising that the underground spring or stream resulted in unforeseen delays, GBT's reluctance to approve an engineered solution undoubtedly aggravated the delay, particularly given the extra cost and time to remove the resultant ice when temperatures plummeted in February. F&W requested an engineered solution to the underground steam as early as January 9, 2015. (Lewis, 11/16/2017, 38:24-39:2; Pl's Lew. Exs. 196, 205.) Mr. Lewis, an architect by training, sketched a solution to the underground stream on February 25. (Lewis, 11/16/2017, 42:12-43:1; Pl's Lew. Ex. 231.) That solution was ultimately adopted by the site engineer and approved by the local authorities to allow construction of a French

drain. (Lewis, 11/16/2017, 45:12; Pl's Lew. Exs. 249, 252, 277.) The French drain was constructed May 19, 2015. (Lewis, 11/16/2017, 45:12; Pl's Lew. Ex. 259.) GBT and GBT's geotechnical engineer had previously maintained that the underground stream would only affect construction and was therefore a matter of "means and methods" within F&W's scope of work. (Lewis, 11/16/2017, 38:24-39:2; Pl's Lew. Exs. 196, 205.) The Court recognizes that this was a tenable position based on the information available to GBT at the time, but nonetheless had GBT approved the initial request in January, or simply adopted Mr. Lewis's solution in February, the delays resulting from the underground stream would have been mitigated.

Construction of the Turner store was also delayed as the result of the failure of the concrete building slab. First, the pouring of the building slab was delayed from November 30 to December 16, 2014. On November 30, F&W requested a change order approving winter condition costs for the removal of snow from the site so the slab could be poured before an upcoming winter storm. (Lewis, 11/16/2017, 16:14-18:11; Pl's Lew. Exs. 179, 181-183.) The change order did not issue until after the storm hit. As a result, F&W was required to request an additional change order for ground thaw units. (Lewis, 11/16/2017, 20:2-23:25.) This resulted in further delays. (Lewis, 11/16/2017, 23:20-21.) The slab was finally poured on December 16, 2014. (Lewis, 11/16/2017, 26:1-9; Pl's Lew. Exs. 186, 189-190, 275.) On February 11, 2015, F&W first observed heaving and cracks in the Turner store building slab. (Pl's Com. Ex. 155.) The slab failure was determined to be caused by earth movement. (Pl's Lew. Ex. 302.) As will be discussed in more detail relating to the West Paris store below, GBT was required under the Mater Contract to purchase a builder's risk insurance policy that covered earth movement; however, the policy purchased by GBT excluded earth movement. (*See* Pl's Com. Ex. 28 at § 10.3.1.) While this lapse of GBT undoubtedly delayed the approval of the change order authorizing the demolition and re-pouring of the slab at

23

the West Paris store it is likely why GBT was similarly delayed in authorizing the change order for the re-pour at the Turner location.[18] GBT's claim under its builder's risk policy was denied by the insurance company on March 17. (Pl's Lew. Ex. 302.) The change order authorizing the removal and replacement of the slab was issued on March 25, 2015. (Pl's Lew. Ex. 239.)

Design issues involving a catch basin[19] ("CB-2") were first noted by F&W on October 20, 2014. F&W was instructed to nonetheless install CB-2 at the elevation specified in the plans in October despite the plans being incorrect. (Lewis, 11/16/2017, 54:17-25; Pl's Lew. Ex. 147.) F&W proceeded to install the base coat of asphalt and then wait for an engineered solution to the CB-2 elevation. (Lewis, 11/1/6/2017, 55:15-56:11.) As late as May 7, 2015, F&W was still waiting for the engineered solution to the elevation issue. (Lewis, 11/1/6/2017, 57:18-24; Pl's Lew. Ex. 256.) The design was issued thereafter and on May 27, 2015, F&W removed CB-2 and addressed the elevation issue according to a revised plan. (Lewis, 11/1/6/2017, 59:13-14; Pl's Lew. Ex. 264.)

Finally, on May 29, 2015, GBT issued a change order revising the landscaping project on May 29, 2015: well after the substantial completion date and delaying actual substantial completion. (Lewis, 11/1/6/2017, 60:5-15; Pl's Lew. Ex. 107 at TUR 000427.)

## 5. Oakland

F&W encountered site issues at the Oakland store as well. The project plans for the Oakland store indicated that fill from the site could be used for structural fill; however, after testing, the fill proved insufficient and structural fill had to be located elsewhere and hauled in. This work took place between October 30 and November 19 and required a change order. (Fortney, 11/14/2017, 72:6-7; Pl's Oak. Exs. 103 at OAK 000252, 176, and 112.)

---

[18] As at West Paris, discussed in more detail below, F&W repeatedly requested a copy of the builder's risk policy and the additional insured certificate during this time period. GBT failed to oblige this request. (*See* Pl's W.P. Ex. 157.)
[19] A catch basin in this context is an underground structure that acts as a chamber for the collection of waste water from a paved surface before it is ultimately diverted away by an underground pipe. (Lewis, 11/16/2017, 54:15-17.)

24

Furthermore, F&W encountered an unforeseen rock ledge at the site, which had to be blasted with dynamite to be removed. (Fortney, 11/14/2017, 77:13-78:1.) The blasting occurred over thirteen days between November 10 and November 22. (Fortney, 11/14/2017, 79:5-23; Pl's Oak. Exs. 103 at OAK 000092, 117-119, 165-167.) The blasting had to be completed in order to build up the pad and to start the footer excavation. (Fortney, 11/14/2017, 86:25-87:2.)

This unanticipated and unscheduled site work significantly delayed the pouring of the slab and pushed it into freezing December temperatures. As a result, F&W was required to use ground thaw units, resulting in further delays associated with obtaining the equipment and getting winter condition costs approved by change order. (Fortney, 11/14/2017, 92:2-94:23; Pl's Oak. Exs. 103 at 000212, 129, 131, 133.) Sam Fortney kept GBT informed of these delays. This delayed erection of the metal building into January, which, as noted above, was on average colder than normal, and sometimes far colder. Mr. Fortney provided vivid testimony of how extreme cold limited workers to fifteen-minute shifts interspersed with rotations in F&W's trailer, consistent with Mr. Lewis's testimony regarding a similar practice on the Turner site. (Fortney, 11/14/2017, 105:25-106:25; *see* Pl's Oak. Exs. 141, 144, 171-172 (daily reports/ correspondence documenting days in which no work could be undertaken because of the weather).)

6. West Paris

The West Paris store location also required site remediation work. Andy Vannice, F&W's project manager for the West Paris project, described the delays experienced by F&W on the project, including delays associated with unsuitable soils. (Vannice, 11/16/2017, 161:10-162:13; F&W W.P. Ex. 103 at 00257-00264). Mr. Vannice also testified that GBT directed a change in the specification for the asphalt paving that resulted in delay. (Vannice, 11/16/2017, 160:11-13.) Furthermore, GBT delayed approval of winter conditions, which delayed the pouring of the

building slab. (Vannice, 11/16/2017, 160:16-20, 167:1-2; Pl's W.P. Exs. 103 at 000157, 000162, 117-118, 122-123.) There were further delays in the approval of the shop drawings for the pre-engineered metal building. (Vannice, 11/16/2017, 160:21-161:2, 170:15-172:15; Pl's W.P. Exs. 101, 128.)

As at Turner, the building slab at West Paris failed due to earth movement. F&W and GBT first observed the heaving of the slab as early as March 11, 2015. (Vannice, 11/16/2017, 176:5-15; Pl's W.P. Ex. 139.) As of March 20, 2015, there was a directive to remove and replace the heaved slab.[20] (Vannice, 11/16/2017, 177:15-21; Pl's W.P. Ex. 146.) However, GBT did not issue authorization to F&W to proceed with the work until May 18, 2015, more than two months after the heaving was first observed. Between March 11 and May 18, 2015, Mr. Freeh repeatedly requested a copy of the builder's risk policy and the additional insured certificate. (Pl's Com. Ex. 170; Pl's W.P. Ex. 157.) GBT did not honor this request until May 11, 2015. (Pl's W.P. Ex. 160.) While GBT was concealing the fact that it did not purchase a builder's risk policy with earth-movement coverage as required by the Master Contract, Mr. Robinson informed other members of the GBT team that he was handling F&W's demand for a copy of the policy "carefully." (Pl's W.P. Ex. 159.) The slab removal and replacement was completed on May 26, 2015. (Vannice, 11/16/2017, 181:10; Pl's W.P. Ex. 171.)

As noted above, Mr. Vannice was providing GBT with updated project schedules as the work proceeded on the West Paris store. On May 21, 2015, after the change order for the removal and replacement of the slab was issued, Mr. Vannice produced an updated project schedule with a substantial completion date of July 6, 2015. (Pl's W.P. Ex. 107 at p. 10.) After GBT received the

[20] After being directed by GBT to remove and replace the slab, Mr. Stewart asked Mr. Vannice for an updated schedule, and Mr. Vannice sent Mr. Stewart the May 8 updated schedule with a substantial completion date of June 17, 2015. (Vannice, 11/16/2017, 178:11; Pl's W.P. Ex. 107 at p.9.) Mr. Stewart did not express any dissatisfaction with this updated schedule. (Vannice, 11/16/2017, 178:13.)

May 21 schedule, Mr. Cole asked Mr. Stewart "[W]hy is [the West Paris store] not going to make it? What steps have we taken to make it happen? What I need is a non-BS answer about why we are yet again unable to make this delivery." (Pl's Com. Ex. 60.) Mr. Stewart's response explains that it was a result of delay associated with the replacement of the slab, and that said delay related to GBT's failure to obtain a builder's risk policy that covered earth movement:

> Dude,
> The reality is we spent well over thirty days discussing the tear out of the slab. F&W pushed the issue of builders [*sic*] risk and delayed the re-pour, [h]ad that not happened we would have made the date. So to your point, *we are at fault in some manner. I don't know what else to say. We tried to work things in our favor and F&W called the bluff . . . . That is the non BS answer.*
> (Pl's Com. Ex. 60 (emphasis added).)

## V.     F&W INVOICE AND GBT PAYMENT HISTORY

GBT made the internal decision to stop payment to F&W sometime in April 2015. (Lozina, 1/22/2018, 165:9-13.) GBT did not actually stop payment until June. The brief history summarized below shows what was invoiced and unpaid during the relevant period. The unpaid invoices described were not adjusted or rejected in accordance with the contract. (Freeh, 11/13/2017, 111:21-112:2; Pl's Ex. 28 at § 9.2.) As explained in more detail below, as of July 22, 2015, the unpaid F&W invoices totaled $788,006.51. As of October 31, 2015, F&W was owed a total of $1,445,960.03. Through settlements with unpaid subcontractors paid by GBT and credited to outstanding F&W invoices, the balance owed to F&W has been reduced to $819,735.31. (Pl's Com. Exs. 97, 101.)

### 1. Lewiston

The invoice and payment history for the Lewiston project is reflected in Plaintiff's Lewiston Exhibit 109. (Freeh, 11/13/2017, 102:13-15.) F&W submitted invoices to GBT on May

27

21, 2015 and August 24, 2015 (totaling $48,678.05) and notified GBT of retainage previously withheld as due on October 31, 2015. As of October 31, 2015, GBT owed F&W $132,669.96 for unpaid invoices. After credits following settlement payments by GBT directly to subcontractors, GBT owes F&W $77,954.91 for the Lewiston project. (Pl's Com. Ex. 101.)

2. Turner

The invoice and payment history for the Turner project is illustrated in Plaintiff's Lewiston Exhibit 111. (Freeh, 11/13/2017, 103:24-104:2.) F&W submitted invoices to GBT on June 16, 2015 and July 21, 2015 (totaling $147,203.15) and notified GBT of retainage previously withheld as due on October 31, 2015. As of October 31, 2015, GBT owed F&W $276,110.55. After credits following settlement payments by GBT directly to subcontractors, GBT owes F&W $93,645.32 for the Turner project. (Pl's Com. Ex. 101.)

3. Oakland

The invoice and payment history for the Oakland project is illustrated in Plaintiff's Oakland Exhibit 104. (Freeh, 11/13/2017, 100:15-101:25.) F&W submitted an invoice to GBT on May 20, 2015 which was paid in part, leaving $62,020.59 due. F&W submitted further invoices to GBT on May 21, 2015, June 16, 2015 August 24, 2015 (totaling $250,911.11) and notified GBT of retainage previously withheld as due on October 31, 2015. As of October 31, 2015, GBT owed F&W $431,792.31. After credits following settlement payments by GBT directly to subcontractors, GBT owes F&W $329,280.75. (Pl's Com. Ex. 101.)

4. Auburn

The invoice and payment history for the Auburn project is illustrated in Plaintiff's Lewiston Exhibit 108. (Freeh, 11/13/2017, 103:19-21.) F&W submitted invoices to GBT on June 16, July 21, and August 26, 2015 (totaling $68,733.87) and notified GBT of retainage previously withheld

as due on October 31, 2015. As of October 31, 2015, GBT owed F&W $178,795.66 for the Auburn project. After credits following settlement payments by GBT directly to subcontractors, GBT owes F&W $101,556.12 for the Auburn project. (Pl's Com. Ex. 101.)

5. West Paris

The invoice and payment history for the West Paris project is illustrated in Plaintiff's West Paris Exhibit 104. (Freeh, 11/13/2017, 104:23-105:2.) F&W submitted invoices to GBT on June 16, 2015, July 22, 2015, and August 24, 2015 (totaling $323,960.89) and notified GBT of retainage previously withheld as due on October 31, 2015 ($102,630.35). As of October 31, 2015, GBT owed F&W $426,591.45. After credits following settlement payments by GBT directly to subcontractors, GBT owes F&W $217,298.21 for the West Paris project. (Pl's Com. Ex. 101.)

VI.    GBT'S CLAIMS FOR REIMBURSEMENT FOR DEFECTIVE AND INCOMPLETE WORK

The Court heard evidence of repairs that GBT was required to make to the stores after F&W stopped work as a result of non-payment.[21] Although there was evidence of additional work, GBT is only seeking to recover payment from F&W for the following work: the replacement of the roof curbs on four of the projects, remedial paving at the Lewiston and Oakland projects, and the replacement of a sidewalk at the Auburn project.

After F&W ceased work on the projects, GBT hired PM Construction to perform "punch-list work" and other repairs in August of 2015. (Dutremble, 11/17/2017, 60:16-19.) This work is summarized in the punch lists attached to Ron Stewart's emails to Jason Dutremble found in Plaintiff's Common Exhibits 68 and 69. Thereafter Mr. Dutremble was sent a follow-up email

---

[21] There is no dispute that the five Maine stores had reached substantial completion and were open for business at the time that F&W issued its stop work notice on July 31, 2015 (Pl's Com. Ex. 29) and ceased work on August 7, 2015. (Pl's Com. Ex. 30.) GBT's position is that it can back charge F&W for work it hired others to undertake after that date pursuant to § 3.9.3 of the Master Contract. (*See* Pl's Com. Ex. 28.) These claims were acknowledged, but not addressed, in the Court's Summary Judgment Order. (Summ. J. Order 21.)

29

with additional tasks for PM Construction. (Pl's Com. Ex. 76.) These tasks were identified by representatives of DG who took a tour of all five stores with Mr. Dutremble and GBT employees, including Mr. Tomlin and Mr. Stewart, on August 21, 2015.[22] (Pl's Com. Ex. 70.) This work was invoiced by PM Construction and paid by GBT. (*See* GBT Exs. 92, 142; Dutremble, 11/17/2017, 141:25.) The only notice provided to F&W were the August 21, 2015 letters from Mr. Cole to Mr. Freeh assessing liquidated damages. (Pl's Com. Ex. 32.) These letters communicated GBT's dissatisfaction with F&W's work generally and its tardiness specifically. (Pl's Com. Ex. 32.) Although this correspondence identifies deficiencies as to each store, the August 21 letters do not list any of the work GBT now characterizes as "incomplete or defective." (Pl's Com. Ex. 32.) Mr. Lozina consistently testified that no further notices were sent to F&W, even as the purported deficiencies and incomplete work GBT is now suing for were discovered. (Lozina, 1/22/2018, 196:3, 198:6, 221:16-17.)

### 1. Roof Curbs

A roof curb is a fabricated piece of insulated tin that supports a rooftop unit ("RTU"). (Lewis, 11/16/2017, 102:10-11.) The heating, ventilation, and air conditioning ("HVAC") systems for each of the Maine stores were comprised of four RTUs. (Def's Exs. 130 at 3266, 131 at 3326-3329, 132 at 3388, 133 at 3442, 134 at 3462.) Each RTU is installed on a roof curb. (Fortney, 11/14/2017, 185:3-6.) The roof curb is also comprised of a metal box which covers the RTU. (Fortney, 11/14/2017, 185:12-18.) The roof curb is a separate system from the roof.[23] (Fortney, 11/14/2017, 185:20.) F&W installed roof curbs and RTUs on the five Maine stores. After the

---

[22] On direct examination, Mr. Dutremble testified that the stores were "ninety-nine percent constructed" when he first visited the Maine stores. (Dutremble, 11/17/2017, 105:20; *see* Pl's Com. Ex. 78.)

[23] GBT's counterclaim for breach of contract with respect to the costs of removing and replacing the roof of the Lewiston store was decided on summary judgment in F&W's favor on the grounds that GBT failed to provide F&W with written notice and the opportunity to correct the alleged defects in the roof. (Summ. J. Order 26-31.)

August 21 site visit, GBT and DG determined that the roof curbs were improper and needed to be replaced on four stores. (Francis, 1/19/2018, 111:20; Lozina, 1/19/2018, 231:18-233:1; Def's Ex. 193.) The roof curbs for the Oakland store were not replaced. (*Id.*) GBT did not notify F&W of the purported defect but did direct PM Construction to replace the roof curbs. (Pl's Com. Ex. 94.)

GBT admits that the construction plans it provided to F&W pursuant to the contract addenda did not provide specifications for the roof curbs for four of the stores. (GBT Post-Trial Br. 25; *see* Def's Exs. 130 at 3266, 132 at 3388, 133 at 3442, 134 at 3462; Pl's Com. Ex. 79.) The construction plans for the Oakland store included roof curb specifications. (Def's Ex. 131 at 3328.) The curbs installed by F&W on the other stores were not intended for a "shed roof" or "raised-seam roof" (*i.e.* a sloped roof) and therefore did not have integral crickets[24] on the uphill side to divert water running down the roof. (Pl's Com. Ex. 92.) GBT was not aware of the fact that the plans lacked specifications for the roof curbs until September 16, 2015, after F&W had stopped work on the Maine stores. (Pl's Com. Ex. 81; Lozina, 1/22/2018, 220:20-21.) Nonetheless, F&W was informed that GBT planned to replace the Lewiston roof as well as the roof curbs at the "Auburn, Oakland,[25] and Turner locations" in an email from GBT's litigation counsel to F&W's attorney. (Pl's Com. Ex. 91.) There is evidence that F&W had contemporaneous knowledge that the Lewiston roof curbs were the "wrong curbs."[26] (Def's Ex. 198.) F&W also had information that the roof curbs on the West Paris store required a "retrofit" pursuant to an inspection report provided by ADVOCON, Inc. that Mr. Vannice forwarded to Mr. Freeh on July 16, 2015. (Def's Ex. 16 at 0069, 0106.) Mr. Vannice and Mr. Freeh confirmed that this report identified issues with the roof

---

[24] A "cricket" is "a deflection plate on the upside of the roof . . . a little ridge . . . to divert the water." (Fortney, 11/14/2017, 190:11-12.) Whether a roof curb includes a cricket can be easily determined by observation. (Lewis, 11/16/2017, 103:1-3; Vannice, 11/16/2017, 204:14.)

[25] Presumably *sic*; the Oakland roof curbs were not replaced. (Def's Ex. 193.)

[26] Sam Fortney testified that while he could not recall specifically, the crickets on the Lewiston store may have been modified to make them functional on a raised-seam roof. (Fortney, 11/14/2017, 193:5-20.)

31

curbs at West Paris. (Freeh, 11/15/2018, 128:13-20; Vannice, 11/16/2017, 213:16.) Mr. Vannice testified that these issues remained unresolved when F&W stopped work on August 7. (Vannice, 11/16/2017, 213:9-19.) Mr. Lewis could not remember when he learned that the roof curbs delivered to the Auburn and Turner stores were "trashed" because the HVAC subcontractor found that the steel building subcontractor had already installed roof curbs on those buildings—albeit, from GBT's perspective, the metal building subcontractor had installed deficient curbs because they lacked integral crickets. (Lewis, 11/16/2017, 105:14-21; *see* Def's Ex. 11.) Whether the retrofitted roof curbs with field-installed (as opposed to integral) crickets were sufficient is disputed by the parties. Mr. Lewis testified that the roof curbs installed at Auburn were "appropriate." (Lewis, 11/16/2017, 77:25.) Tom Morton, who at that time worked for American Aerial, PM Construction's subcontractor who removed and replaced the curbs, testified that "To be quite honest with you, I didn't . . . actually see an issue with the curbs." (Morton, 1/19/2018, 129:1-2.) Mr. Lozina himself seemed to note the distinction between whether the curbs were "defective" or merely "unauthorized" or not "specified," and did not disagree that the replaced roof curbs fit in the latter category as opposed to the former.[27] (Lozina, 1/22/2018, 174:7-9; 246:23-247:1, 251:6-9.) Regardless, as noted above, by October 2015 Messrs. Freeh, Fortney, and Lewis all knew that GBT was replacing roof curbs at Turner, Auburn, and West Paris. (*See* Def's Ex. 10.)

2. Paving at the Lewiston and Oakland stores

On August 6, 2015, F&W exchanged emails with Rick Shaw of B&S Paving concerning the terms of a contract to perform binder (*i.e.* asphalt paving) repair to the parking lot at the

---

[27] In recognizing that the directive to replace the roof curbs came from DG, Mr. Lozina also acknowledged some responsibility on the part of GBT for failing to get the updated specifications to the general contractor. (Lozina, 1/22/2018, 256:9-21.)

Lewiston Store. (Def's Ex. 29 at 0212.) On August 17, 2015, B&S Paving invoiced F&W $19,623.10 for this scope of work. (Def's Ex. 25; Shaw, 11/17/2017, 40:1-12.) F&W never made payment on this invoice. (Shaw, 11/17/2017, 40:17-21.) Around December 9, 2015, GBT began discussions with B&S Paving to perform additional and unrelated remedial paving at the Maine stores. (Def's Ex. 26 at 0183.) GBT directly paid B&S Paving for the remedial work Mr. Shaw performed at the Lewiston store. (Def's Ex. 26 at 0183; Shaw, 11.17.2017, 38:12-39:3.) On August 2, 2015, Mr. Stewart wrote to Sam Fortney to explain that the damage to the paving was "a failure caused by workmanship" and directing F&W to proceed with the repairs "at no additional cost to GBT." (Pl's Lew. Ex. 278.) Mr. Fortney disputed this claim. (Pl's Lew. Ex. 278.) At trial, Mr. Fortney testified that the pavement failed at the Lewiston store as a result of subgrade failure, suggesting that GBT's geotechnical engineer improperly certified the site as ready to pave. (Fortney, 11/14/2017, 53:16-54:18.) On cross-examination, Mr. Shaw testified that a site engineer may have been there and that he certified the site. (Shaw, 11/17/2017, 49:3-50:8.)

GBT also makes a damage claim for the Oakland store for costs associated with paving a private drive adjacent to the store, remediating defective grading, and providing erosion control measures. The owner of the property adjacent to the Oakland store is Wayne Tibbetts, who owns and operates a business on that property, Somerset Stone and Stove. (Tibbetts, 1/19/2018, 158:7-20.) At the time that GBT first acquired the real property for the Oakland store, GBT agreed to remove Mr. Tibbetts's driveway and to connect his driveway to the Oakland store's parking lot. (Tibbetts, 1/19/2018, 159:2-160:23.) Mr. Stewart noted that F&W completed this work as described in the site plans provided by GBT by July 23, 2015. (Pl's Com. Ex. 128.)

On July 15, 2015, Mr. Tibbetts sent an email to F&W expressing concerns with the grades of the earthwork that F&W had overseen to date. (Def's Ex. 57; Tibbetts, 1/19/2018, 167:6-15.)

33

Mr. Tibbetts's specific concern was that the initial grade stakes that were installed "had been moved and then when they had been put back, they did not make any sense . . . the grades was [*sic*] lower than the banks, so that the water would not have been able to get out of the driveway." (Tibbetts, 1/19/2018, 168:16-169:6, 176:15-20.) At this point in time F&W had not installed any erosion control on the banks of his driveway. (Tibbetts, 1/19/2018, 168:2-6, 178:14-18.) On July 21, 2015, Mr. Tibbetts sent an email to Sam Fortney containing photographs of damage that a recent rainstorm had caused to the grading, resulting in portions of the driveway being washed out. (Def's Ex. 201 at 4873-4877; Tibbetts, 1/19/2018, 169:7-18, 185:3-12.)

Upon learning of this issue, Sam Fortney emailed Mr. Freeh and proposed that F&W contact the earthwork subcontractor to have him provide erosion control. (Def's Ex. 201 at 4873.) However, this never occurred. (Tibbetts, 1/19/2018, 178:19-22.) Mr. Tibbetts eventually reached out to GBT about these issues. (Tibbetts, 1/19/2018, 172:11-16.) GBT then contracted directly with Mr. Tibbetts to perform the remedial work necessary to finish his driveway. GBT paid Mr. Tibbetts for this work. (Tibbetts, 1/19/2018, 186:20-21.) However, there is no evidence that F&W did not properly perform its contracted scope of work in the first instance. Mr. Tibbetts testified that he was unfamiliar with that scope and contract. (Tibbetts, 1/19/2018, 177:1-19.)

### 3. Sidewalk at the Auburn store

GBT's claims include a claim for the removal and replacement of a sidewalk on the Auburn project.[28] In GBT's August 21, 2015 letter concerning the Auburn project, Mr. Cole reported that "[t]he front sidewalk needs to be replaced due to frost heave." (Pl's Com. Ex. 32.) Paul Lewis identified the heaved sidewalk as seventy feet by ten feet. (Lewis, 11/16/2017, 77:14.) Mr. Lewis

---

[28] F&W filed and served a third-party complaint against A.P. Concrete for indemnification for all sums awarded in favor of GBT and against F&W with respect to the Auburn sidewalk; A.P. Concrete never answered the complaint and the Clerk entered default on the third-party complaint on June 13, 2016.

agreed that a portion of the sidewalk at Auburn "needed to be replaced." (Lewis, 11/16/2017, 77:11.) In an email dated July 30, 2015, from Mr. Freeh to Mr. Stewart, Mr. Freeh agreed that the sidewalk needed to be replaced and informed Mr. Stewart of his unsuccessful attempts to coordinate with the concrete subcontractor, A.P. Concrete, that had installed the sidewalk. (Def's Ex. 1-2; Lewis, 11/15/2017, 124:24-125:10.) On August 3, 2015, Mr. Freeh and Abe Phinney of A.P. Concrete exchanged emails blaming each other for the failure of the sidewalks. (Def's Ex. 2.) On August 5, 2015, Mr. Lewis also emailed Mr. Phinney a detailed list of the remedial work required for the sidewalk at the Auburn store. (Def's Ex. 3.) This was after F&W had sent its "seven-day notice" of its intent to stop work but two days before it stopped work on the project. (*See* Pl's Com. Ex. 29, 30.) Thereafter, GBT hired Berry Construction to remediate deficient sidewalks at the Auburn store. (Lozina, 1/22/2018, 266:17-22.)

F&W points out that Mr. Cole recognized that the sidewalk damage was a result of "frost heave," a form of earth movement, and that repair costs therefore should have been covered by GBT's builder's risk policy. (Pl's Com. Ex. 28 at § 10.3.1.) F&W further points out that GBT issued change orders to repair heaved sidewalks at the Lewiston and Oakland projects, implying that GBT had previously recognized that it was liable for costs associated with remedial work required as a result of frost heave. (*See* Pl's Lew. Ex. 106 at TUR 000364; Pl's Oak. Ex. 103 at OAK 000347.)

## ANALYSIS

I.    GBT'S CLAIM FOR LIQUIDATED DAMAGES

     a.    *Dairy Farm Leasing Co.* is Inapposite in this Case; GBT's Entitlement to Liquidated Damages was Decided on Summary Judgment

As a threshold matter, the Court disagrees with F&W that GBT failed to meet its burden under *Dairy Farm Leasing Co. v. Hartley*, 395 A.2d 1135 (Me. 1978). *Dairy Farm* stands for the

uncontroversial proposition that a "plaintiff has the burden of proving his damages." *Id.* at 1138-39. In that case, the defendant "clearly raised this issue [of the enforceability of the liquidated damages provision of the form lease agreement] at the hearing on damages in Superior Court. His argument was reiterated several times during the hearing." *Id.* at 1140 (citing *Interstate Industrial Uniform Rental Serv., Inc. v. Couri Pontiac, Inc.*, 355 A.2d 913, 922 (Me. 1976)). In this case, F&W never raised the issue of the enforceability of the liquidated damages provision of the Master Contract. *Dairy Farm* is also distinguishable because that case dealt with "a complex and overlapping scheme of remedies" in a form lease agreement that failed to explain why liquidated damages were appropriate. *Dairy Farm Leasing Co.*, 395 A.2d at 1138. By comparison, the liquidated damages provision in the Master Contract is straightforward and unambiguous, as this Court has already concluded on summary judgment. (Summ. J. Order 12.) The provision also recites why liquidated damages are appropriate and why the amount contemplated is reasonable:

> 6.4.1.1 The Contractor understands that if the Date of Substantial Completion established by this Agreement, as may be amended by subsequent Change Order, is not attained, *the Owner will suffer damages which are difficult to determine and accurately specify*. The Contractor agrees that if the Date of Substantial Completion is not attained, the Contractor shall pay the Owner One Thousand dollars ($1,000.00) *as liquidated damages and not as a penalty* for each Day that Substantial Completion extends beyond the Date of Substantial Completion.

(Pl's Com. Ex. 28 at § 6.4.1.1 (emphasis added).) Furthermore, in its Summary Judgment Order, this Court concluded that "there are no genuine disputes regarding F&W's liability for liquidated damages under the terms of the Master Contracts[.]" (Summ. J. Order 16.) Implicit in that conclusion is a finding that the *Dairy Farm* requirements have been satisfied, *i.e.* that the damages caused by the breach are difficult to estimate accurately and the amount agreed to is reasonable to compensate one party for the loss occasioned by the breach of the other party. *Dairy*

*Farm Leasing Co.*, 395 A.2d at 1137 (citing *Interstate Industrial*, 355 A.2d at 921). To be clear, F&W's admissions for purposes of summary judgment do not preclude it from taking a contrary position at trial. M.R. Civ. P. 56(d). However, F&W made a strategic decision not to challenge the appropriateness or reasonability of the liquidated damages contemplated in the Master Contract and the Court's Summary Judgment Order resolves that issue in GBT's favor. The Court, however, left for trial the consideration of F&W's affirmative defenses to liquidated damages. (Summ. J. Order 16.)

b.  GBT Waived its Right to Assess Liquidated Damages Through its Conduct

Waiver is the voluntary or intentional relinquishment of a known right. *Interstate Indus. Unif. Rental Serv., Inc.*, 355 A.2d at 919. "If a party entitled to a contractual right acts inconsistent with that right, the party is estopped from asserting that right if renunciation of the waiver would prejudice the party who has relied upon it." *Id*. Waiver may be inferred from the conduct of the waiving party. *Id*. To bar enforcement of a contractual right, the waiver "must have induced a belief in the party who is claiming reliance on that waiver that the waiving party intended voluntarily to relinquish his rights." *Id*. Therefore, "in determining the question of waiver, the Court must look not only to the conduct of [GBT] but also to the effect of those acts on [F&W] who now claims it was thereby lulled into a false security." *Id*.

Equitable estoppel precludes a party from asserting a contractual right against another person who has in good faith relied upon the party's conduct and who has been led to change her position for the worse. *Blue Star Corp. v. CKF Props., LLC*, 2009 ME 101, ¶ 27, 980 A.2d 1270. Although similar to waiver, equitable estoppel "requires a misrepresentation that may arise through a combination of misleading statements, conduct, or silence." *Id*. (citation and quotations omitted). In order to establish equitable estoppel, a defendant must demonstrate that the party seeking to

enforce a contractual right misrepresented or concealed an existing fact, upon which the defendant justifiably relied to its detriment. *Chrysler Credit Corp. v. Bert Cole's L/A Auto Sales, Inc.*, 1998 ME 53, ¶ 27, 707 A.2d 1311.

The Court concludes that GBT's conduct was inconsistent with its contractual right to assess liquidated damages against F&W.

First, updated schedules with extended substantial completion dates were issued by F&W for all five projects. GBT never objected to the extended substantial completion dates reflected in these numerous updated construction schedules issued by F&W. The Court recognizes that under the Master Contract GBT was not obligated to raise an objection to the schedules to preserve its claim for liquidated damages. (Pl's Com. Ex. 28 at § 13.5.) However, GBT's failure to do so is nonetheless evidence of conduct that is inconsistent with that contractual right. Mr. Robinson testified that he never objected to the updated schedules. (Robinson, 1/16/2017, 50:22-24.) GBT's internal correspondence as well as its communication with F&W express at worst a begrudging acceptance of the substantial completion dates forecasted by F&W. This is consistent with the testimony of F&W's witnesses as to why they were surprised when GBT assessed liquidated damages against F&W. Messrs. Fortney and Lewis explained that GBT was well aware of the issues encountered at the stores and the resulting delays in the project schedule. Mr. Stewart himself in internal correspondence noted that these delays and the extreme winter weather in particular had been well-documented on the five Maine stores. (*See* Pl's Com. Ex. 63.) Furthermore, with regards to the Lewiston store, the substantial completion date in the project schedule was initially extended not as a result of delay, but at the explicit request of GBT. This is affirmative conduct entirely inconsistent with GBT's contractual right to assess liquidated damages from the date reflected in the contract addendum for the Lewiston store.

38

Second, GBT continued to issue change orders for each project after the substantial completion date for that project had passed. None of the change orders issued before or after the passing of the substantial completion date reflected a change in the time required to complete the contract. Mr. Fortney and Mr. Lewis, in apparent recognition of this problem, attempted to unilaterally modify the change orders issued by GBT when they executed by them. GBT responds that this request should have been made in the request for change order submitted by F&W. However, Mr. Fortney and Mr. Lewis testified that requests for change orders could only be submitted on GBT's electronic form, and that this form did not allow them to change the value of the box labeled "The Contract time be changed by (days)." This explains why Mr. Fortney and Mr. Lewis attempted to make the change *post hoc*. Considering that the changes contemplated in some change order requests would obviously take additional time to complete and that F&W was keeping GBT apprised of delays on the project through updated project schedules and correspondence, GBT's decision to continue to issue change orders after the passing of the substantial completion dates is conduct inconsistent with the contractual right to assess liquidated damages based on those substantial completion dates.

Finally, Mr. Fortney and Mr. Lewis also wrote letters to GBT detailing the problems they were encountering and the delays that resulted. These letters were never answered by GBT. Instead, Mr. Beard suggested to Mr. Cole that the letters were untimely based on a "technicality," and recommended the two men meet to discuss the Master Contract. Neither of these men testified at trial, but it can be inferred that the two men ultimately decided to disregard the letters. This silence is inconsistent with the contractual right to assess liquidated damages based on the substantial completion dates in the contract addenda: The Master Contract requires "equitable extension of the Contract Time" for delays beyond the control of the contractor. (Pl's Ex. 28 at §

39

6.3.1.) F&W was regularly attempting to communicate delays to GBT; these letters are perhaps the most explicit instance of those attempts. GBT was clearly getting the message, but declined to respond or make any overtures regarding equitable extension of the contract time. Instead, GBT presumably decided to rely on section 6.3.3 of the Master Contract, which requires the contractor to provide written notice of delay within twenty-four hours of encountering the delay. At the same time, as described below, Mr. Stewart was telling Mr. Fortney and Mr. Lewis that extensions of the contract time would be handled after completion of the stores.

The Court concludes that GBT misrepresented its intentions when it told F&W that contract extension issues would be considered at the conclusion of the projects.

Mr. Fortney and Mr. Lewis testified consistently regarding GBT's response when they raised concerns regarding the substantial completion date: that those concerns would be dealt with later, after the stores were complete, by the issuance of a no-cost change order extending the substantial completion date for all stores. Both men heard this from Mr. Stewart. Mr. Stewart did not testify at trial. Contemporaneous correspondence corroborates Mr. Lewis's testimony. When Mr. Lewis reached out to Ms. Baylor to correct requests for change orders that GBT had already approved and issued change orders for because "there [were] time considerations," Mr. Stewart responded that if the cost was correct, "I'm asking what time has to do with it." The rest of the email clarifies that a time extension is a "general condition" that can be handled separately, presumably upon completion based on Mr. Lewis's testimony regarding his conversations with Mr. Stewart. (Pl's Com. Ex. 102.)

GBT points out that the substantial completion date for Oakland was extended by change order prior to project completion, but the circumstances that gave rise to that change order undercut GBT's position that the same could have been done for the other stores. Ms. Baylor had sent

40

change orders to Mr. Fortney for both the Lewiston and Oakland stores that included a substantial completion date in November, consistent with the contract addenda for those stores. Mr. Fortney wrote back that the substantial completion date was not correct; Ms. Baylor thereafter got Mr. Stewart's permission to issue a no-cost change order to extend the substantial completion dates for those stores. Inexplicably, a no-cost change order was issued to extend the substantial completion date for only the Oakland store—not Lewiston, which as explained above was extended by F&W at GBT's request.[29]

These circumstances demonstrate both that GBT was able to issue a change order extending the substantial completion date in the absence of a request for change order and that the onus was entirely on GBT to actually issue the change order extending the date. The substantial completion date for Oakland was extended in December 2014 in the manner summarized above, in response to an email from Mr. Fortney regarding both the Oakland and Lewiston stores. Oakland was changed; Lewiston was not. The discrepancy can only be explained by either GBT's oversight or deliberate choice. There was nothing more F&W could do.

As to why the record does not contain similar emails from Mr. Lewis or Mr. Vannice to GBT complaining that the substantial completion date was not correct on the change orders issued in other projects, the answer is most likely a result of timing. GBT issued the change order extending the substantial completion date for the Oakland store on December 17, 2014. Thereafter, the project managers had been instructed not to request time extensions, with the explanation that all such requests would be handled upon completion of the stores. Indeed, Mr. Lewis sent his email to Ms. Baylor regarding the "time considerations" on GBT's recent change orders the very next day, on December 18. The upshot of that email correspondence was Mr. Stewart's decision that

_____

[29] This helps explain Mr. Lozina's confusion on cross-examination as to whether it was the Lewiston or Oakland store that had its substantial completion date extended by change order. (Lozina, 1/22/2018, 232:23-233:2.)

41

time considerations would be handled separately. From that point forward, F&W was relying on Mr. Stewart's representations to its project managers that the extension of the substantial completion date would be handled separately upon completion.

The Court concludes that F&W was justified in relying on GBT's misrepresentations and inconsistent conduct as it relates to the assessment of liquidated damages.

There is ample evidence that F&W relied on GBT's conduct and representations with regard to extensions of the substantial completion date. Mr. Freeh, who the Court found particularly credible, provided a succinct summary of how and why F&W relied on GBT's waiver:

> We relied on [Mr. Stewart's representation that time extensions would be handled later] by them not rejecting items we sent to them [*sic*], by continuing to do work, by continuing to do change order work, by continuing to communicate the way we had been doing, and actually, their silence rather confirmed to me that Sam's depiction of his understanding of Ron [Stewart]'s statement was true—that they were going to ignore this issue until the end.

(Freeh, 11/13/2017, 129:4-11.) Mr. Freeh explicitly testified that he thought, through the conduct described above, that GBT was waiving any right it had to assess liquidated damages under the contract. (Freeh, 11/13/2017, 129:25.) Mr. Fortney and Mr. Lewis testified consistently regarding their understanding that GBT had waived its right to assess liquidated damages and their detrimental reliance on that understanding. (*See* Fortney, 11/14/2017, 29:4-12, 51:1-52:18; Lewis, 11/16/2017, 72:4-15.)

The parties' course of dealing on the Pennsylvania and Ohio DG stores, described above, is evidence for why F&W's reliance was justified. It helps explain why F&W's witnesses were surprised when GBT assessed liquidated damages for the Maine stores. Most of the Pennsylvania and Ohio stores finished late and yet GBT did not assess liquidated damages on any of them. This makes it all the more reasonable that F&W understood GBT's silence when it received updated

project schedules as acceptance of the substantial completion date in those schedules. Such an approach was consistent with the parties' course of dealing.

The circumstances resulting in delays in this case further justified F&W's reliance. All five projects experienced unforeseen site issues before erection of the buildings could commence, which pushed the projects into unusually harsh winter conditions. All of the projects were subject to numerous and significant change orders, some of which required engineered solutions, that further delayed completion, including change orders directing F&W to remove and replace the entire building slab for the Turner and West Paris projects. The projects were also delayed as a result of the unusually harsh winter of 2014-15. (Pl's Comm. Ex. 63.) The Court acknowledges that GBT's position is that winter conditions never would have been encountered had F&W mobilized earlier and that in general delays were a result of manpower deficiencies and F&W's mismanagement of the projects. But from F&W's perspective, the delays were not their fault, and GBT did not inform F&W that it considered them responsible for the delays until after the substantial completion dates had passed and Mr. Stewart had told F&W that time extensions would be considered later.

With regards to the complaint that F&W could have mobilized to the sites earlier, F&W's project managers consistently explained that a lot of work is completed after the notice to proceed is issued and before physical work starts at the project: *e.g.* reviewing contracts and other documents, writing scopes of work, negotiating contracts with subcontractors, establishing a project schedule, issuing purchase orders, and coordinating with the site superintendent. (Lewis, 11/16/2017, 89:15-19; Fortney, 11/14/2017, 13:2-13.) The Master Contract itself enjoins the contractor from knowingly commencing the work before the notice to proceed is issued. (Pl's Com. Ex. 28 at § 6.13.) Finally, as noted above, F&W was regularly providing GBT with project

schedules, including initial schedules which indicated when mobilization to the site was to occur. The only complaint F&W heard from GBT about these initial schedules was that Lewiston was scheduled to finish too early. (Pl's Lew. Ex. 126.)

The nature of the delays further justifies F&W's belief. The unforeseen site issues encountered at every jobsite were the responsibility of the geotechnical engineer, which was beyond F&W's scope of work and hired directly by GBT. The poor weather and winter conditions encountered on the site were also unforeseen and outside of F&W's scope: GBT had bargained for the exclusion of winter conditions from the contract. As a result, it was undeniably required to bear the financial liability of dealing with an unusually harsh winter. (*See* Pl's Com. Ex. 63.) F&W was justified in believing that GBT bore the burden from a temporal perspective as well.

In general, the record supports the conclusion that F&W believed it was working together with GBT to get the projects completed as soon as possible despite the unforeseen issues they encountered at the sites and with the weather. It did not view GBT as an adversary. It was not unreasonable for F&W to rely on GBT's manifestations under such circumstances. (*See, e.g.*, Pl's Lew. Ex. 228 (Ron Stewart thanking and congratulating F&W on February 19, 2015); Pl's Com. Ex. 155.)

GBT argues that F&W's position on waiver has wavered throughout the litigation, and that this indicates that F&W never truly believed that GBT had waived the liquidated damages provision of the Master Contract. GBT's principal evidence for this argument is correspondence dated August 25, 2015 from GBT's counsel to Mr. Cole at GBT that states "Your calculation of liquidated damages ignores GBT's extensions of the substantial completion date. [F&W] met the extended substantial completion date[.]" (Pl's Com. Ex. 33.) This correspondence does not mention waiver.

44

F&W's position in this letter is not inconsistent with the position that F&W took at trial. The critical element to the defense of waiver is that the party against whom a contractual right is asserted has been "lulled into a false security" by being led to believe that the other party intended to waive that right. *See Interstate Indus. Unif. Rental Serv., Inc.*, 355 A.2d at 919. In this case, F&W's belief—from when this letter was sent until F&W filed its post-trial brief—is that GBT had assented to the later substantial completion dates reflected in F&W's updated project schedules and correspondence between the parties. In its argument for summary judgment, F&W claimed that this mutual assent was sufficient to extend the substantial completion date, an argument that the Court rejected when it concluded that the substantial completion date could only be extended by change order as contemplated in the Master Contract. But this did not resolve the question of whether GBT could still assess liquidated damages calculated from those substantial completion dates if F&W could prove at trial that GBT led F&W to believe that the substantial completion dates reflected in the Contract addenda would not form the basis of an assessment of liquidated damages and F&W was justified in that belief. The Court was not expecting F&W to produce evidence that liquidated damages as such were discussed between the parties at any point until GBT assessed liquidated damages against F&W on August 21, 2015. (See Pl's Com. Ex. 32.) Indeed, Messrs. Freeh, Fortney, and Lewis all testified that they were surprised to learn that GBT was assessing liquidated damages against F&W not because of communications they had had with representatives of GBT related to liquidated damages but because of communications that they had had related to the substantial completion date. For purposes of the legal issue presented to the Court, the real factual issue is and has been whether GBT led F&W to believe that the substantial completion dates in the contract addenda were wrong (*i.e.* Lewiston, *see* Pl's Com. Exs. 43-44, 51, Pl's Lew. Ex. 228) or that they would be extended later. (*See, e.g.*, Pl's Com. Ex. 102.) This is the

45

factual assertion put forth by F&W's counsel in its correspondence of August 25, 2015 and the factual assertion that F&W proved at trial. From F&W's perspective, whether they were led to believe that GBT was waiving its right to assess liquidated damages or the requirement that the substantial completion date be extended through change order is unimportant. Contrary to GBT's argument, F&W's actual or subjective belief relative to GBT's waiving of its right to asses liquidated damages has not evolved; F&W has merely adapted its legal theories as to the relevance of that belief based on the Court's ruling (from actual extension of the substantial completion date by mutual assent to a waiver of the right to assess liquidated damages based on the original substantial completion dates reflected in the contract addenda).

GBT also points to an email from Mr. Paquin, F&W's site superintendent, to Mr. Lewis dated January 15, 2015. Mr. Paquin wrote "I was told by Ron Stewart yesterday that F&W needed to stop sending in these change order requests and just get the work done . . . . The next time Paul talks about getting additional costs approved you need to remind him that it's $1,000 a day liquidated damages." (Def's Ex. 69.) This email was forwarded to Mr. Freeh, who responded "This is why every change order [n]eeds to have the agreed to revised completion date." (Def's Ex. 69.) Mr. Lewis forwarded this message from Mr. Freeh to Sam Fortney.

At the outset, this email further corroborates Mr. Lewis and Mr. Fortney's testimony with regards to Mr. Stewart telling them to get the work done, not request time extensions through change orders, and that time extensions would be handled after the stores were complete. But furthermore, a single email in which Mr. Paquin reports that Mr. Stewart told him to remind Mr. Lewis about liquidated damages is insufficient evidence to prove that F&W's belief that GBT would not enforce liquidated damages based on the substantial completion date in the contract addenda was unreasonable. Mr. Freeh also testified that he believed his instructions in this email

were followed by Messrs. Fortney, Lewis, and Vannice to the best of their ability, but that "we [didn't] control the change order documents. GBT did. But they did write letters. They did send emails. They did submit revised schedules[.]" (Freeh, 11/13/2017, 128:15-21.) Mr. Lewis and Mr. Fortney also attempted to adjust the substantial completion dates on change orders unilaterally, as F&W did not "control the change order documents." GBT argues that this is evidence that they never subjectively believed that there had been mutual agreement that the substantial completion dates were extended or that liquidated damages were waived. The Court disagrees. F&W was prudently doing everything it could to document what it reasonably believed had been agreed to.

In conclusion, F&W has proved its affirmative defenses of waiver and equitable estoppel. F&W has established by a preponderance of the evidence that GBT, through its silence and affirmative conduct, acted in a manner inconsistent with its contractual right to assess liquidated damages as explained above. Furthermore, GBT made many representations to F&W as to how and when time extensions would be formally handled—at the conclusion of the projects— representations that were never followed through on or acknowledged after the stores reached substantial completion or before GBT stopped paying F&W's payment applications and F&W stopped work on the projects. Finally, these actions on the part of GBT induced the reasonable belief on the part of F&W that GBT would not assess liquidated damages against F&W based on the substantial completion dates reflected in the contract addenda. F&W's reliance on that waiver is established through the testimony of F&W's witnesses and the simple fact that they continued to work on the projects without insisting that GBT issue a change order extending the substantial completion date on each project. F&W would be prejudiced if it were now required to pay a large liquidated damages award to GBT. GBT therefore waived its right to assess liquidated damages against F&W and is equitably estopped from doing so.

47

## II.   F&W IS ENTITLED TO REMEDIES UNDER THE PROMPT PAYMENT ACT

Like several other states, Maine has enacted statutes to ensure that contractors, subcontractors, and material suppliers are paid timely. These statutes are found in Chapter 201-A to the Maine revised statutes at 10 M.R.S. §§ 1111-1120, and collectively are commonly referred to as the "Prompt Payment Act" ("PPA"). F&W argues that it is entitled to the special remedies provided for under the PPA because of GBT's failure to timely make progress payments that were invoiced by F&W and due under the contract. F&W further argues that GBT must pay its attorney fees as the substantially prevailing party. GBT counters that the special remedies provided under the PPA do not apply because F&W has not demonstrated that it performed in accordance with the agreement between the parties. Alternatively, GBT argues that the special remedies contemplated in the PPA may not be assessed against it because GBT withheld payments in good faith.

The PPA provides three separate and distinct remedies for failure to make prompt payment: (1) interest, (2) attorney fees, and (3) penalties. 10 M.R.S. §§ 1113(4), 1118(2), 1118(4). "[I]f any progress or final payment to a contractor is delayed beyond the due date . . . the owner shall pay the contractor interest on any unpaid balance due beginning on the [following] day, at an interest rate equal to that specified in [14 M.R.S. § 1602-C]." 10 M.R.S. § 1113(4); *accord id.* § 1114(4) (interest assessed on delayed payments to subcontractors and material suppliers). "Notwithstanding any contrary agreement, the substantially prevailing party in any proceeding to recover any payment within the scope of [the PPA] must be awarded reasonable attorney's fees . . . ." *Id.* § 1118(4). Section 1118(2), titled "Penalty," reads in pertinent part:

> If . . . litigation is commenced to recover payment due under the terms of this chapter and it is determined that an owner . . . has failed to comply with the payment terms of this chapter, the . . . court shall award an amount equal to 1% per month of all sums which payment has been wrongfully withheld . . . as a penalty.

48

*Id.* § 1118(2). The PPA includes protections for owners as well:

> Nothing in [the PPA] prevents an owner . . . from withholding payment in whole or in part under a construction contract in an amount equaling the value of any good faith claims against an invoicing contractor . . . including claims arising from unsatisfactory job progress, defective construction or materials, disputed work or 3rd-party claims.

*Id.* § 1118(1). Furthermore, "[a] payment is not deemed to be wrongfully withheld if it bears a reasonable relation to the value of any claim held in good faith by the owner . . . ." *Id.* § 1118(3).

### 1. F&W Performed in Accordance with the Contract

In order to succeed on claims arising under the PPA, F&W must prove that "(1) the services were performed in accordance with the agreement or understanding of the parties, (2) the contractor had invoiced the work, and (3) the owner failed to make payment within twenty days after receipt of the invoice." *Brunswick Topsham Water Dist. v. Layne Christensen Co.*, No. CUMCV-2007-333 at 3 (Me. Super. Ct., Cum. Cty., May 7, 2009) (citing 10 M.R.S. § 1118(3)). GBT argues that F&W cannot satisfy the first of these conditions. (GBT's Post-Trial Rebuttal Br. 37-43.) As grounds for this argument, GBT claims that (1) the Maine stores were incomplete and suffered from defective work when F&W stopped work on the stores; (2) F&W failed to attain substantial completion by the substantial completion date in the contact addenda; and (3) F&W failed to properly staff and manage the projects. (GBT's Post-Trial Rebuttal Br. 38.)

GBT's argument that the Maine stores were incomplete and suffered from defective work when F&W stopped work on the project misses the mark. The relevant inquiry is only whether the services were performed *in accordance with the agreement*. Provided that F&W stopped work in

49

accordance with the contract, it is irrelevant what the projects looked like at that time.[30] The work could only be "stopped" if work remained to be done.

The Court concludes that F&W stopped work in accordance with the Master Contract. Section 9.4 of the Master Contract allows F&W to stop work upon seven-days' written notice for non-payment. By July 2015, GBT had stopped making progress payments to F&W in violation of section 9.1.1 of the Master Contract. F&W, through its attorney, served notice of its intent to stop work on July 31, 2015. Thereafter, F&W stopped work on August 7. Because F&W stopped work in accordance with the contract, F&W cannot be said to have failed to satisfy its contractual obligations based on the state of the projects at that time. Both letters expressed F&W's willingness to resume work on the projects if all overdue invoices were paid in full and a change order were issued to compensate F&W for the reasonable costs and time resulting from the shutdown, delay, and startup. At trial, Mr. Freeh testified that on and after August 7, 2015, F&W was ready and able to resume work on the projects upon payment of the outstanding invoices. (Freeh, 11/13/2017, 120:17.)

Furthermore, and as explained in more detail below, F&W was entitled to notice and an opportunity to cure the purported defects and the five letters sent by Mr. Cole to Mr. Freeh on August 21 were completely inadequate under the contract. (Pl's Com. Ex. 28 at §§ 11.2, 11.3; Pl's Com. Ex 32.)

In sum, regardless of the state of the projects on that date, F&W was entitled to stop work for non-payment and did so in conformity with the Master Contract. The Court thus concludes that

---

[30] Although, as noted above, according to GBT's own witness, the stores were ninety-nine percent complete with only minor punchlist items remaining when PM Construction was hired to complete the projects. There is no dispute that all five stores had reached substantial completion and were open for business by the time F&W had stopped work on the projects.

F&W performed its services in accordance with the contract, thereby entitling it to the remedies and penalties of the PPA.[1]

## 2. GBT Does Not Meet the "Good Faith" Exception to the PPA's Penalties and Remedies

GBT's alternative argument is that the payments it withheld were in an amount equaling the value of its good faith claims against F&W. 10 M.R.S. § 1118(1). GBT maintains that the amount of its withholding at least bears a reasonable relation to the value of that good faith claim. *Id.* § 1118(3).

The question of which party bears the burden of proving whether GBT satisfies the "good faith" exception to the PPA is unresolved under Maine law. The limited case law suggests that in practice both owners and contractors have presented evidence and argument as to why the exception does or does not apply, respectively. *See Cellar Dwellers, Inc. v. D'Alessio*, 2010 ME 32, ¶ 18, 993 A.2d 1; *Elm Cos. v. Beal*, No. RE-00-08, 2004 Me. Super. LEXIS 211, at * 37-38 (*Hjelm, J.*, August 27, 2004); *Elec. Eng'g & Elecs., Inc. v. E.L. Shea, Inc.*, 146 F. Supp. 2d 74, 79 (D. Me. 2001). Other jurisdictions have reached differing conclusions. *Compare* [CITES]. The parties did not brief the issue.

Under the facts of this case, it is unnecessary to determine which party bears the burden. On the record before the Court it is clear by a preponderance of the evidence that GBT's withholding amount was not equal to, or in reasonable relation to, the value of its claims against F&W.

GBT did not have any contractually valid "claims" against F&W based on purportedly defective work because GBT did not provide F&W notice of the alleged defect and an opportunity

---

[1] GBT's remaining arguments do not warrant much discussion. Liquidated damages are GBT's contractual remedy for F&W's failure to complete the projects by the substantial completion date, a remedy that it waived through its conduct as described above. GBT's complaint that F&W failed to properly staff and manage the projects is specifically described in section 11.2 as a default to which F&W is entitled to contractual notice: notice that F&W never received.

51

to cure the defect. The August 21 letters sent to F&W by Mr. Cole were inadequate under the contract. (Pl's Com. Ex. 28 at §§ 3.9.1, 11.2.) However, GBT did have a claim for liquidated damages against F&W because all five stores reached substantial completion after the substantial completion date established in the contact addenda. Although the Court concludes in this judgment that GBT waived that right through its conduct, GBT nonetheless held the claim in good faith.

However, the amount of potential liquidated damages that GBT could claim does not bear "a reasonable relation" to the amount GBT withheld in payment from F&W—the amount withheld far exceeds the amount of potential liquidated damages. GBT's assessment of liquidated damages against F&W on August 21, 2015 amounted to $498,000.[32] (Pl's Com. Ex. 32.) As of August 26, 2016, GBT owed F&W $839,487.17.[33] (Pl's Lew. Exs. 108-109, 111; Pl's Oak. Ex. 104; Pl's W.P. Ex. 104.) This is without including the retainage previously withheld in accordance with section 9.1.4 of the Mater Contract. (Pl's Com. Ex. 28.) When that sum is considered the amount of GBT's withholding balloons to $1,445,959.80. (Pl's Lew. Exs. 108-109, 111; Pl's Oak. Ex. 104; Pl's W.P. Ex. 104.) Even when all of the remedial work invoiced by GBT after F&W stopped work, valued by Mr. Lozina at $755,120 (Def's Ex. 204; Lozina, 1/22/2018, 109:7-14) is added to F&W's potential liquidated damages, the total—$1,253,120—is less than the amount of GBT's withholding by $192,839.80.[34] Even when valued at its total outer limit, without any inquiry into whether any portion of that withholding was not in "good faith," the amount of GBT's withholding

---

[32] As explained above, GBT's assessment of liquidated damages for the Oakland store improperly failed to account for the no-cost change order extending the substantial completion date recited in the contract addendum to January 30, 2015. The Court's figure of $498,000 adjusts the total to account for this change.

[33] Even subtracting the amounts invoiced for each project after Mr. Cole's August 21 letter (submitted between August 24-26, 2015), the total amount that had been invoiced and remained unpaid was $718,986.10. Even this sum is too great to bear a "reasonable relation to the value" of GBT's good faith claim.

[34] There is no case law in Maine on what amount is considered to be in "reasonable relation" to an owner's good faith claim. Compare 10 M.R.S. § 1118(1),(3) *with* CAL. BUS. & PROF. CODE § 7108.5 (specifying that prime contractor "may withhold no more than 150 percent of the disputed amount").

does not "equal[] the value" of the payment withheld; it far exceeds it.[35] 10 M.R.S. § 1118(1). GBT admits this in its rebuttal brief. (Def's Post-Trial Rebuttal Br. 59, 62.)

Regardless, the Court finds that GBT's inchoate claims for incomplete and deficient work (of which GBT failed to provide F&W notice and an opportunity to cure) could not have been held in good faith. GBT's primary witness for the faulty condition of the stores was Mr. Francis. GBT did not take Mr. Francis's complaints seriously when he was on-site and did not communicate those complaints to F&W. Mr. Robinson also testified as to the "very, very poor" workmanship at the Maine stores when he first visited in mid-January. (Robinson, 1/16/2018, 62:23-63:1, 65:5-24.) However, his contemporaneous correspondence belies this position and instead indicates an attitude of cooperation with F&W in the Spring of 2015. (*See, e.g.* Pl's Com. Ex. 53 ("Fortney is committed to getting the job done"), Pl's Com. Ex. 51.) GBT has now abandoned most of these claims and seeks recovery only for the roof curbs at four stores, remedial paving at Lewiston and Oakland, and a portion of the sidewalk at the Auburn store, which by its own valuation is $185,891.22: begging the question of how much of Mr. Lozina's $755,120 estimate was really held in good faith. (Def's Post-Trial Br. 42.) Furthermore, Mr. Lozina admits that at the time of the withholding, he did not value the claim at $755,120 because he "had no idea how much it was going to cost [ ] to complete all [the] remedial work . . . no idea how much that total bill would be." (Lozina, 1/22/2018, 136:8-13.) While the GBT employees actually responsible for making the decision to withhold payment did not testify at trial, to the extent that Mr. Lozina purports to

---

[35] The Court's calculations are based on the analyses of the relevant financial exhibits provided by both parties. (Def's Post-Trial Rebuttal Br. 56-60; Pl's Post-Trial Br. 17-19.) The parties' calculations differ slightly from each other and from the Court's. This is a result of timing: the amount of withholding changed each time F&W sent a new invoice to GBT and GBT declined to pay, reject, or modify the invoice; the amount of GBT's claim changed as it paid PM Construction's invoices. (Pl's Post-Trial Br. 57; Def's Post-Trial Rebuttal Br. 59.)

speak for them, this admission is inconsistent with the proposition that GBT withheld payment "equaling the value of any good faith claim." *See* 10 M.R.S. § 1118(1).

### 3. F&W's Recovery Under the PPA

Based on the foregoing, F&W is entitled to recover under the PPA. F&W is entitled to statutory interest on the unpaid invoices from the date they came due at the contractual and statutory amount of 8.44%. 10 M.R.S. § 1113(4), 14 M.R.S. § 1602-C(1)(A),(B). (*See* Pl's Com. Ex. 28 at § 9.8.) F&W is entitled to recover a penalty equal to 1% per month of all sums for which payment has wrongfully been withheld. 10 M.R.S. § 1118(2). Finally, F&W is entitled to recover its attorney fees as the substantially prevailing party, in an amount to be determined by post-judgment petition in accordance with the agreement of the parties.

## III. GBT'S COUNTERCLAIM FOR INCOMPLETE AND DEFICIENT WORK

GBT seeks to recover payment from F&W for the replacement of the roof curbs on four of the projects, remedial paving at the Lewiston and Oakland projects, and the replacement of a sidewalk at the Auburn project. Under section 3.9.1 of the Master Contract:

> If . . . within one year after the date of Substantial Completion of the Work, any Defective Work is found, *the Owner shall promptly notify the Contractor in writing.* Unless the Owner provides written acceptance of the condition, the Contractor shall promptly correct the Defective Work at its own cost and time and bear the expense of additional services required for correction of any Defective Work for which it is responsible. *If within the one-year correction period the Owner discovers and does not promptly notify the Contractor or give the Contractor an opportunity to test or correct Defective Work, the Owner waives the Contractor's obligation to correct that Defective Work as well as the Owner's right to claim a breach of the warranty with respect to that Defective Work.*

54

(Pl's Com. Ex. 28(emphasis added).) GBT does not dispute that it never provided F&W with contractual notice of the defective work claims it now pursues against it. Instead, GBT claims that because F&W had actual notice that the work was defective, this Court should follow *In Re Redondo Const. Corp.*, 678 F.3d 115, 123 (1st Cir. 2012) and conclude that "strict conformity with a contract's written notice provision is not required so long as the counterparty receives substantially the same information through timely actual notice and suffers no prejudice from the non-conformity." *Id.* (Def's Post-Trial Br. 24-25.) Critically, however, GBT fails to argue that F&W in fact had actual notice of the purported defects for which it now seeks to recover.[36] In other words, GBT has in no way established that F&W received "substantially the same information" regarding these claims through actual notice. (*See* Summ. J. Order 29-31.) GBT has thus waived its claims as to the purportedly[37] defective work.

## CONCLUSION

Based on the foregoing the entry will be:

1. In Docket No. BCD-RE-15-06:

    a. Consistent with the Court's decision on summary judgment, **judgment is entered for Plaintiff F&W on its claims for breach of contract (First, Fourth, and Seventh Causes of Action).** Damages are awarded as follows:

---

[36] Some of the defects for which GBT now seeks to recover—the Auburn sidewalk and arguably the roof curbs ("The roof is installed incorrectly and is leaking")—are mentioned in Mr. Cole's August 21 letters to Mr. Freeh. (Pl's Com. Ex. 32.) It is unrefuted that F&W was not provided an opportunity to cure any of the purported defects—GBT hired PM Construction and others to do the work, thereby forever foreclosing F&W's "opportunity to test or correct the Defective Work." (*See* Pl's Com. Exs. 35, 37; Def's Exs. 21, 22.)

[37] Because the Court concludes that GBT waived its right to recover due to its failure to provide F&W with notice and an opportunity to cure, it need not determine whether the work performed by PM Construction or anyone else after F&W stopped work was a result of any defective work for which F&W was responsible. However, as is evident from the Court's statement of fact in this Judgment, it is far from clear that the work was in fact defective or, if so, that F&W was responsible for the defect.

55

i.  Damages for the Lewiston project for the unpaid invoices equal to $77,956.46

ii. Damages for the Auburn project for the unpaid invoices equal to $101,556.67

iii. Damages for the Turner project for the unpaid invoices equal to $93,645.32 plus interest pursuant to the Master Contract and the Prompt Payment Act and assessed below.

b. **Judgment is entered in favor of Plaintiff F&W on its claims for breach of the Prompt Payment Act (Second, Fifth, and Eighth Causes of Action).** Interest and penalties calculated as of April 1, 2018 are awarded as follows:

i.  Lewiston: interest equal to $18,639.14 and the penalty under the Prompt Payment Act equal to $29,634.69.

ii. Auburn: interest equal to $25,081.17, and the penalty under the Prompt Payment Act equal to $39,913.02.

iii. Turner: interest equal to $27,598.15, and the penalty under the Prompt Payment Act equal to $43,878.78.

Plaintiff F&W is also awarded its attorney fees and costs to be determined in a post-judgment petition pursuant to the agreement of the parties.

c. **Judgment is entered in favor of Counterclaim-Defendant F&W on Counterclaim-Plaintiff GBT's counterclaim for breach of contract.**

2. In Docket No. BCD-CV-15-74:

a. Consistent with the Court's decision on summary judgment, **judgment is entered for Plaintiff F&W on its claim for breach of contract (First Cause of Action).**

56

Damages for breach of contract are awarded equal to $329,280.75 plus interest pursuant to the Master Contract and the Prompt Payment Act and assessed below.

b. **Judgment is entered in favor of Plaintiff F&W on its claims for breach of the Prompt Payment Act (Second Cause of Action).** Interest and penalties calculated as of April 1, 2018 are awarded as follows: interest equal to $69,917.20 and the penalty under the Prompt Payment Act equal to $111,162.69. Plaintiff F&W is also awarded its attorney fees and costs to be determined in a post-judgment petition pursuant to the agreement of the parties.

c. **Judgment is entered in favor of Counterclaim-Defendant F&W on Counterclaim-Plaintiff GBT's counterclaim for breach of contract.**

3. In Docket No. BCD-RE-15-11:

a. Consistent with the Court's decision on summary judgment, **judgment is entered for Plaintiff F&W on its claim for breach of contract (First Cause of Action).** Damages for breach of contract are awarded equal to $217,298.21 plus interest pursuant to the Master Contract and the Prompt Payment Act and assessed below.

b. **Judgment is entered in favor of Plaintiff F&W on its claims for breach of the Prompt Payment Act (Second Cause of Action).** Interest and penalties calculated as of April 1, 2018 are awarded as follows: interest equal to $57,014.83 and the penalty under the Prompt Payment Act equal to $95,381.77. Plaintiff F&W is also awarded its attorney fees and costs to be determined in a post-judgment petition pursuant to the agreement of the parties.

c. **Judgment is entered in favor of Counterclaim-Defendant F&W on Counterclaim-Plaintiff GBT's counterclaim for breach of contract.**

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: 8/9/18

M. Michaela Murphy
Justice, Business and Consumer Court

58

Fortney & Weygandt, Inc.

v.

Oakland DMEP IX, LLC Dollar Texas Properties IX, LLC,
& GBT Realty Corporation Lewiston DMEP C, LLC;
Auburn DMEP IX, LLC, Turner DMEP X, LLC,
Dollar Properties East, LLC West Paris DMP X, LLC,
and Dollar Texas Properties X, LLC

Fortney & Weygandt, Inc.

        Counsel:                       David Very, Esq.
                                              2 Canal Plaza
                                            Portland, ME 04112

Oakland DMEP IX, LLC Dollar Texas Properties IX, LLC,
& GBT Realty Corporation Lewiston DMEP C, LLC;
Auburn DMEP IX, LLC, Turner DMEP X, LLC,
Dollar Properties East, LLC West Paris DMP X, LLC,
and Dollar Texas Properties X, LLC

        Counsel:                       Michael Bosse, Esq.
                                            100 Middle Street
                                            Portland, ME 04104